No. 44,929

State of Kansas, *Appellee,* v. Walter William Cruitt, *Appellant.*

(436 P. 2d 870)

Opinion filed January 27, 1968.

*Robert E. Tilton,* of Topeka, argued the cause, and *E. J. Schumacher,* of Topeka,, was with him on the brief for appellant.

*Robert D. Hecht,* county attorney, argued the cause, and *Robert C. Londerholm,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

Fatzer, J.: The defendant-appellant, Walter William Cruitt, was convicted by a jury of the crime of blackmail in violation of K. S. A. 21-2412.

The state's evidence established that Mrs. Lorna Kithil lived with

her husband and their child in Topeka, and on July 21, 1966, she received a telephone call and the caller demanded sexual liberties, or threatened to harm her child. On August 12, 1966, a second call was made to the Kithil residence; however, there was no conversation because Mr. Kithil answered the telephone. On August 15, 1966, Mrs. Kithil received two telephone calls from the unknown caller. In the first, the caller stated, "[t]he time is soon, the time is soon." In the second, the caller again demanded certain sexual liberties from Mrs. Kithil in return for the safety of her child.

On August 16, 1966, Mrs. Kithil received another telephone call from the unknown caller, making the same threat. This time his demands had changed to money. After receiving that call, the Kithils met with members of the sheriff's department and the Kansas Bureau of Investigation, who previously had been advised of the other telephone calls, and together they made plans to simulate payment of the money and apprehend the caller.

On the morning of August 23, 1966, Mrs. Kithil received another telephone call in which the threat was renewed and she agreed to deliver the money the unknown caller demanded in accordance with his instructions. At approximately 12:10 p. m. on August 23, 1966, Mrs. Kithil received instructions from the caller, that she was to drive to the parking lot at Russ' market in North Topeka. There further instructions would be given her at 4:00 p. m. from a public telephone booth located in the parking lot. In accordance with arrangements between the Kithils, the sheriff and the K. B. I., Mrs. Kithil had in her possession an envelope containing three marked one dollar bills, and paper, instead of the $200 demanded. At 4:00 p. m. Mrs. Kithil was instructed from the telephone booth to leave the money near a railroad sign where the railroad tracks intersect Elmont Road in Shawnee County. The Kithils placed the money as instructed.

A summary of the testimony of the law enforcement officials testifying on behalf of the state shows that the area in which the money was to be left was "staked out." Approximately 45 minutes after the Kithils had placed the money at the designated place, a white 1965 Ford, occupied by a man and a woman, stopped at the railroad crossing and the woman took the envelope left by the Kithils.

The sheriff pursued and stopped the Ford and apprehended the defendant and his wife, the occupants.

The information filed against the defendant on November 21, 1966, omitting the formal captions, alleged:

". . . that Walter William Cruitt at the County of Shawnee, in the State of Kansas aforesaid, and within the Jurisdiction of the Court, on the _____day of August, A. D. 1966, did unlawfully, feloniously and willfully verbally demand of Lorna Kithil with menaces, money, or other valuable security, contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Kansas. Sec. 21-2412, K. S. A."

On December 12, 1966, the appellant's trial commenced, and on the following day the jury returned a verdict finding him guilty of blackmail, as charged in the information. Thereafter, the district court overruled his motion for a new trial, motion in arrest of judgment, and objection to invoking the habitual criminal act, and this appeal followed.

The principal point urged by the appellant is the sufficiency of the information to allege a public offense under the provisions of K. S. A. 21-2412. The statute reads:

"*That whoever, either verbally or by any letter or writing or written or printed communication sent or delivered by him, demands of any person, with menaces, any chattel, money or valuable security;* or accuse, or knowingly sends or delivers any letter or writing or any written or printed communication, with or without a name, or with any letter, mark, or designation, accusing or threatening to accuse any person of a crime punishable by law, or of any immoral conduct, which, if true, would tend to degrade and disgrace such person, or to expose or publish any of his infirmities or failings, or in any way to subject him to the ridicule or contempt of society, or to do an injury to the person or property of any person, *with intent to extort or gain* from such person any chattel, money, or valuable security, or any pecuniary advantage whatsoever, or with intent to compel the person threatened to do any act against his will, with the intent aforesaid, shall be deemed guilty of a felony, and upon conviction thereof be imprisoned in the penitentiary not more than five years nor less than one year, and may be fined not more than one thousand dollars." (Emphasis supplied.)

The defendant contends the information fails to allege the demands were made "with intent to extort or gain," which intent, he asserts, is an essential element of the crime as defined by 21-2412.

We agree with the defendant that where the Legislature expressly refers to intent and makes it an essential element of a statutory offense, such intent must be alleged in the information. In *State v. Minor,* 197 Kan. 296, 416 P. 2d 724, it was held that where an information failed to allege an essential element of an offense, it cannot be cured by the court or the parties proceeding

to trial as if the information properly charged the offense, and a judgment of conviction based upon such information was void.

On the other hand, it has been repeatedly held that the Legislature has the power to forbid the doing of an act and make its commission criminal, without regard to the intent or knowledge of the doer. (*State v. Logan*, 198 Kan. 211, 424 P. 2d 565; *State, ex rel., v. Fairmont Foods Co.*, 196 Kan. 73, 410 P. 2d 308; *State v. Merrifield*, 180 Kan. 267, 303 P. 2d 155; *State v. Beam*, 175 Kan. 814, 267 P. 2d 509; *State v. Avery*, 111 Kan. 588, 207 Pac. 838, 23 A. L. R. 453.) And where an act is made a crime by statute, without any express reference to intent, this court has held that it is not necessary to allege such intent, or any intent, but simply to allege the commission of the act in the language of the statute, and the intent will be presumed. (*State v. Brown*, 173 Kan. 166, 171, 244 P. 2d 1190; *State v. Bush*, 45 Kan. 138, 25 Pac. 614; *State v. Avery*, supra.)

K. S. A. 21-2412 defines the offense of blackmail, and includes within its provisions several classes of offenses. In many respects the statute lacks that clearness of meaning and accuracy that should characterize legislation, and, as drafted, is calculated to give rise to many perplexing questions. However, by the terms employed, the punctuation used, and the purpose manifested by its language, we are of the opinion the statute makes distinction between "demand" directly made, either verbally or in writing, with menaces, for chattel, money or valuable security, and written or printed letters or communications, "accusing" or "threatening to accuse" any person:

(1) of a crime punishable by law, or,
(2) of immoral conduct which, if true, would
    (a) tend to degrade and disgrace such person, or,
    (b) expose or publish his infirmities or failings, or,
    (c) in any way subject him to the ridicule or contempt of society, or,
(3) to do injury to the person or property of such person,

with intent to extort or gain from such person any chattel, money or valuable security, or any pecuniary advantage, or with intent to compel the person threatened to do any act against his will.

As indicated, the first type of act denounced by the language preceding the semicolon, makes unlawful a demand with menaces for chattel, money or valuable security, and the crime is completed by means of such threats, whether it is successful or not. The object

of the second type of act denounced by the remainder of the statute is to forbid persons from assuming the character of prosecutors of crime for the purpose of extorting gain to themselves. It declares that anyone who makes accusations of crime with the proscribed intent, or who threatens to accuse another of any of the different types of the offenses with such intent, shall be guilty of a felony.

The word "menaces" as used in the first type of act denounced by the statute, has in it the element of intent to cause evil to happen to another. A "menace," as defined by Webster, is the show of an intention to inflict evil. "Menace" is generally regarded as synonymous with "threat." (*Lynch v. People*, 33 Colo. 128, 79 Pac. 1015.) To "menace" is to act in a threatening manner, and an overt act of a threatening character, short of an actual assault is a "menace." (*Cumming v. State*, 99 Ga. 662, 665, 27 S. E. 177.) In 31 Am. Jur. 2d, Extortion, Blackmail, Etc., § 10, p. 907, a threat is defined to be a menace of such a nature as to unsettle the mind of the person on whom it is intended to operate, and to take away from his acts that free voluntary action which alone constitutes consent. We hold that the words "with menaces" as used in the statute was intended by the Legislature to mean the equivalent of the single word "threatens." Likewise, the word "verbally," as used therein, was meant to imply oral as distinguished from written threats, and indicates an intention upon the part of the Legislature to embrace threats made by word of mouth with intent to cause another to part with chattels, money or valuable security.

Accordingly, our construction of the statute requires the conclusion that the proscribed intent, "intent to extort or gain," is made an essential element only of the offenses defined in the second type of act denounced by the statute. The offense defined in the clause preceding the semicolon was intended by the Legislature to embrace threats made by word of mouth or in writing, and where the threat is directly made with menaces to the person threatened demanding chattels, money or valuable security, the crime is complete.

Our limited research discloses no cases wherein our statute or a statute exactly like our own was construed in light of the issue before us. The case of *State v. Hendren*, 127 Kan. 497, 274 Pac. 274, is not helpful. It deals primarily with venue of a prosecution where the defendants mailed a letter in one county to the complainant in another county "threatening to accuse" him of a crime or crimes punishable by law. However, the case of *State v. Skransewfky*, 5

Ohio N. P. (N. S.) 177, 17 Ohio Op. 575, construed a statute of Ohio which was very similar to 21-2412, and it gives support to our construction of the statute.

From the foregoing, and under the facts and circumstances presented in the record, we conclude the information alleged a public offense within the meaning of 21-2412.

The appellant next contends the district court erred in admitting certain hearsay evidence of Agent Purdy, a member of the KBI, when he testified that the telephone call Mrs. Kithil received at 4:00 p. m. at the parking lot was made from a "phone" booth in the 100 block of Burgess Avenue. Purdy had been called as a witness for the state, and, except as otherwise noted, the evidence in question was elicited upon cross-examination by counsel for the appellant. Purdy testified the appellant checked out of his employment at the Fleming warehouse west of Topeka at 3:31 p. m. on the afternoon in question; that a fellow-employee, one Donald Weekly, checked out at the same time; that Weekly accompanied the appellant in his car to Russ' Market in North Topeka, where they stopped momentarily, and then drove to the Northside Tavern on North Kansas Avenue where both men had one beer, and that the appellant and Weekly left the tavern a few minutes before 4:00 p. m. The evidence complained of is presented in the record as follows:

"Q. Now, where would Mr. Cruitt have been able to make a phone call from that vicinity, or did you check that, as to a public phone?

"A. Yes, at 101 Burgess.

"Q. And that is how many blocks away from the tavern?

"A. About four.

"Q. About four blocks away, straight up the street?

"A. Yes.

"Q. This would have had to be done before or right after 4:00 o'clock, is that right, if he had been the man making the call?

"A. Yes.

"Q. Do you know how far it is from Flemings to the Northside Tavern, in distance?

"A. I would judge about three or four miles.

"Q. Have you actually measured that?

"A. No.

"Q. So you don't know?

"A. No.

"Q. Did Mr. Weekly state approximately how fast they drove to Russ's Market and then over to the tavern?

"A. No.

"Q. You didn't ask him for a breakdown of the time, or an estimate of the time that they spent drinking a beer, traveling and so forth?

"A. No sir.

"MR. TILTON: I believe that is all.

*"Redirect Examination*

"BY MR. BENNETT:

"Q. Agent Purdy, just one question; did your investigation reveal to you where the call was made from that was made to Russ's Market at 4:00 o'clock?

"A. It was made from a phone booth in the 100 block of Burgess Avenue.

"MR. BENNETT: All right.

*"Recross Examination*

"BY MR. TILTON:

"Q. How do you know that?

"A. From information received from the telephone company.

"Q. Well, are you stating that this is what someone told you?

"A. Yes sir.

"MR. TILTON: Your Honor, I request that the answer be stricken as hearsay, not admissible, and if he wants to bring a telephone company employee to tell us this, all right, but I don't think he ought to be allowed to testify as to what someone told him.

"MR. BENNETT: I might state that in response to one of Mr. Tilton's questions, the answer was that the phone call was made from 101 Burgess—

"MR. TILTON: (Interrupting) I asked him where it could have been made from.

"THE COURT: Well, I will overrule the objection. We will now take our afternoon recess."

The testimony complained of by the appellant was hearsay and the court erred in admitting the evidence; however, as we stated in *State v. Earsery,* 199 Kan. 208, 428 P. 2d 794,

". . . the court recognizes that not every error which occurs during the trial of a lawsuit approaches the gravity of prejudicial error and that it is only where error adversely affects some substantial right of a litigant that reversible error may be said to have been committed. (*State v. Engberg,* 194 Kan. 520, 400 P. 2d 701, cert. den. 383 U. S. 921, 15 L. Ed. 2d 676, 86 S. Ct. 899.)" (1. c. 212.)

In determining whether the admission of the hearsay evidence amounted to reversible error we must consider the conditions under which the same was made, and the probable impact of the evidence on the jury must be weighed in light of the surrounding circumstances. Considered in that context, we do not think the admitted hearsay amounted to prejudicial error. From the testimony quoted above, it is observed the testimony elicited from Mr. Purdy by appellant's counsel upon cross-examination supported the strongest possible inference that the telephone call was made from the 100

block on Burgess Avenue, specifically 101 Burgess Avenue. This was adduced not only by the question of appellant's counsel as to where the telephone call could have been made, but by his following questions pertaining to the distance between 101 Burgess Avenue and the Northside Tavern.

In light of the testimony elicited by appellant's counsel, and the probable inference that it would convey to the jury, we do not think the admission of the evidence complained of would have such a damaging impact upon the jury as to be deemed a prejudicial error. Moreover, appellant's counsel should not now be heard to complain of hearsay elicited during redirect examination where counsel by his own questions on cross-examination brought the subject within the proper scope of redirect examination.

The appellant next contends there was not sufficient notice by the state in invoking K. S. A. 21-107a. There is no merit in the contention. The record clearly shows that written notice of the state's intention to request sentencing under the Habitual Criminal Act was mailed to appellant's counsel on December 14, 1966, and that written objection was filed thereto by the appellant on December 28, 1966. Sentence was imposed by the district court at 2:00 p. m. on December 28, 1966, pursuant to the Habitual Criminal Act, for a term of not less than two years nor more than ten years in the Kansas State Penitentiary.

It has been repeatedly stated by this court that a defendant should be timely notified of the state's intention to invoke the Habitual Criminal Act when sentence is imposed by the district court. (*Palmer v. State,* 199 Kan. 73, 427 P. 2d 492; *State v. Messmore,* 175 Kan. 354, 264 P. 2d 911; *Sanders v. Hand,* 190 Kan. 457, 375 P. 2d 785.) There is nothing in the record to indicate that the notice given by the state did not afford the appellant ample time to prepare his defense, if any, under that act. (*State v. Peterson,* 198 Kan. 239, 424 P. 2d 552.)

We have fully examined all other arguments and alleged errors presented by the appellant, and conclude the district court did not err in any of the respects complained of. The judgment of conviction and sentence is affirmed.