No. 66,214

STATE OF KANSAS, *Appellee*, v. DAVID C. JORDAN, *Appellant.*

(825 P.2d 157)

Opinion filed January 17, 1992.

*Lucille Marino*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Don L. Scott*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant David C. Jordan from his conviction of first-degree murder (K.S.A. 1990 Supp. 21-3401).

The defendant claims the trial court erred in not giving a self-defense instruction. If a self-defense instruction should have been given, he argues that he also was entitled to an instruction on involuntary manslaughter on the theory of self-defense committed in an unlawful or excessive manner. He also contends the trial court erred in admitting evidence of his prior juvenile activity (robbery and use of cocaine) and in not granting a new trial because the prosecutor made inflammatory and other improper remarks in closing argument.

The death occurred at the apartment of Deborah Encinias. Deborah's three sons also lived in the apartment, but played no part in the case before us. Deborah's daughter, Brandie Encinias Jones; Brandie's husband, Larry Jones (Jones); and their baby also lived in the apartment, and they witnessed varying segments of the events leading to the death of Samuel Ward. Ward was Deborah Encinias' boyfriend and, although his official residence

was elsewhere, Deborah testified that he was at the apartment "all the time."

Samuel Ward was a large man, being described as tall as 6 feet 5 inches and weighing 213 pounds or more. He was 37 years old. The defendant, David Jordan, was 19 years of age, 6 feet in height, and weighed approximately 150 pounds when he killed Ward. Ward and Jordan were not acquainted.

The record before us shows disputed testimony and inconsistent testimony among different witnesses to the same event and among the same witnesses' testimony at the preliminary hearing and the trial. Those inconsistencies are of no significance because of the standard of review in considering whether the trial court erred in refusing to give an instruction on self-defense and involuntary manslaughter. That standard will be discussed later.

In order to have an overview, a highly summarized version of the events is set forth at this point, looking at the evidence in a light most favorable to Jordan. Greater detail will follow under specific issues. We begin with what occurred with Jones seated in a car parked outside a friend's home. Jordan was in the home.

Jordan and Jones were approximately the same age; Jones was 20 years of age at the time of the trial. Although they were good friends at one time, everyone seemed to agree there now was animosity between the two. When Jones learned Jordan was in the house, he wanted to leave because he was afraid a fight would start. Jordan approached the car and asked Brandie Jones where her husband was because Jordan wanted to buy some marijuana. Jordan testified Jones was the only person in town who had any marijuana. Jordan also testified he had been drinking heavily after getting off work and was in a good mood. He testified Brandie shoved him away from the car and he left. The Joneses testified Jordan referred to Jones as a "punk snitch." The Joneses, including Chris Jones (Larry's brother), and Joseph Allen, a friend of Chris Jones and Jordan, then proceeded to Deborah Encinias' apartment.

About five minutes after the Jones group arrived at the Encinias apartment, Jordan pounded on the door. Deborah Encinias answered the door and was pushed back by the door as Jordan pushed the door open with some force. Jordan inquired whether Larry was there. His exact language is in dispute. Although the

majority of the people who were in the apartment thought Jordan was looking for a fight with Jones, Jordan testified he was not looking for a fight.

Samuel Ward stepped between Jordan and Deborah Encinias, asked Jordan to leave, and stated there would be no fighting at the apartment. Taken in the light most favorable to Jordan, Ward then put both his hands on Jordan's chest and pushed him out the door. Ward went outside the door not more than four feet. Jordan pulled a knife and attempted to strike Ward with it. Ward retreated into the yard, made a loop, and then broke and ran into the house. Jordan ran after him and stabbed Ward in the heart, causing Ward's death.

Jordan was charged with first-degree murder and convicted of that offense by a jury.

## 1. Self-Defense

Self-defense is defined in K.S.A. 21-3211: "A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force." A reasonable belief incorporates both a subjective and an objective belief. K.S.A. 21-3211, Judicial Council Comment, 1968.

In denying Jordan's request for a self-defense instruction, the trial judge commented:

"[W]hen we talk about substantial evidence of self-defense, I think we have to be talking about at the time of the incident. The testimony about—if there was testimony that—because it was certainly contested as to whether that was the testimony—as I recall it, whether or not Mr. Ward put his hands on the defendant, was if it happened, it happened at the doorway. The undisputed testimony was that prior to the time of the stabbing—and this includes the undisputed testimony of [the defendant's] witness—that Mr. Jordan pursued the [decedent] from outside into the kitchen. Now, that is an act which is separated in time from the acts that [defense counsel] talks about over the—of the hands maybe placed upon the chest. Because long since, if Mr. Jordan could pursue Mr. Ward into the kitchen, he could also have run the other way without a great deal of difficulty. And I do not see—not only do I not see substantial evidence, because the defendant didn't testify that it was self-defense, the only thing he testified to was he said he was touched, I think with two hands on the chest. If it was going to be self-defense in regards to that, it should have been at that point in

time, not at some later time when the decedent is fleeing and he is pursuing. And I am not going to give the self-defense instruction. . . .

". . . . There is absolutely no evidence of self-defense in this matter. . . . The self-defense has to be at the time that the stabbing took place, not prior to that. Once he's pursuing the decedent, there's nothing for him to defend himself from. There is no—not only is there not substantial evidence, there was no evidence."

Self-defense issues have been before this court on many occasions. We have stated:

"The circumstances under which a defendant is entitled to an instruction on self-defense are discussed in *State v. Childers,* 222 Kan. 32, 563 P.2d 999 (1977). In *Childers,* this court stated that, 'in order to rely on self-defense as a defense, a person must have a belief that the force used was necessary to defend himself and, also, show the existence of some facts that would support such a belief.' 222 Kan. at 48. In determining whether there is evidence that the defendant believed that force was necessary to defend himself, ' "it is well to remember the test is not how much but is there any." ' 222 Kan. at 49 (quoting *State v. Smith,* 161 Kan. 230, 237, 167 P.2d 594 [1946]). It is the duty of the trial court to instruct the jury on self-defense so long as there is any evidence tending to establish self-defense, although the evidence may be slight and may consist solely of the defendant's own testimony. *State v. Smith,* 161 Kan. at 237." *State v. Hill,* 242 Kan. 68, 78, 744 P.2d 1228 (1987).

See *State v. Burgess,* 245 Kan. 481, 487, 781 P.2d 694 (1989); *State v. Heiskell,* 8 Kan. App. 2d 667, 673, 666 P.2d 207 (1983).

"The issue is not whether it is probable or even likely that the defendant was, in fact, acting in self-defense. The issue is whether there is any evidence supporting defendant's statement that the force . . . used was necessary . . . . Because, viewing all the evidence in the record in the light most favorable to the defendant, there is some evidence of physical aggression on the part of [the victim], and some evidence of a fear of assault on the part of the defendant, an instruction on self-defense should have been given." *Hill,* 242 Kan. at 79.

*Cf. State v. Childers,* 222 Kan. 32, 49, 563 P.2d 999 (1977) (no evidence victim verbally or physically threatened defendant so trial court did not err in refusing to give instruction on self-defense).

In *State v. Blocker,* 211 Kan. 185, Syl. ¶ 7, 505 P.2d 1099 (1973), this court stated that "[a] person who is under personal attack is justified in using such force, but only such force, to defend himself against imminent serious bodily harm, as appears

reasonably necessary to him for that purpose under the circumstances then confronting him." The *Blocker* court also noted that "in defending one's self against unlawful attack and serious bodily harm," a person may lawfully use such force as may reasonably seem necessary to him or her "but may not go further than appears reasonably necessary for such purpose." 211 Kan. at 192.

Additionally, we have said that "[u]nder the common law, the excuse for killing in self-defense is founded upon necessity, be it real or apparent." *State v. Stewart*, 243 Kan. 639, 644, 763 P.2d 572 (1988).

"Our test for self-defense is a two-pronged one. We first use a subjective standard to determine whether the defendant sincerely and honestly believed it necessary to kill in order to defend. We then use an objective standard to determine whether defendant's belief was reasonable—specifically, whether a reasonable person in defendant's circumstances would have perceived self-defense as necessary." 243 Kan. at 649.

When we speak of "necessary," we mean to prevent imminent serious bodily harm.

"[An] individual who willingly provoked the mutual combat is not justified or excused in taking life unless he has withdrawn in good faith, has communicated that withdrawal to his opponent, and has done all in his power to avert the necessity of killing." *State v. Meyers*, 245 Kan. 471, Syl. ¶ 1, 781 P.2d 700 (1989).

K.S.A. 21-3214 provides that self-defense is not available to a person who:

"(3) Otherwise initially provokes the use of force against himself or another, unless:

"(a) He has reasonable ground to believe that he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant; or

"(b) In good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force, but the assailant continues or resumes the use of force."

Jordan testified to the following: He had been drinking heavily on July 23, 1990, the day Ward was killed. Jordan stated he had not carried the knife for any "evil purpose." While drinking with his friends, one of them had given him a knife because he had broken his. Jordan normally carried one for his job; he used a

knife to cut sacks and twine. He also said his mood was "mellow," "[k]ind of euphoric." He was not mad at anyone. Jordan decided to walk to the Encinias apartment to buy some marijuana from Jones. After walking about a half block, Marc Johnson, a friend he had been with that day, picked him up and drove him over to the apartment because of Jordan's state of intoxication. Upon arriving at the apartment, Jordan's direct examination testimony was as follows:

"A: I knocked on the door, and someone answered. I don't—You know, I don't remember who it was. And then all these faces popped up at the door.

"Q: Do you remember what you said at the door?

"A: Yeah, I asked where was Larry.

"Q: Now, you've sat through most of this testimony, and more than one witness has said there was a pounding or bam-bam-bam. Do you remember striking the door particularly hard?

"A: I may have.

"Q: Do you know [whether] you did or not?

"A: No, not really.

"Q: Were you looking for a fight?

"A: No, I wasn't.

"Q: Did you want to kill anybody?

"A: No, I didn't. I never meant to kill no one.

"Q: Standing there at the door of the apartment, what was your mood?

"A: I don't know. I guess I was, you know—you know, I was trying to finish enjoying the rest of the day.

"Q: And what occurred after these people had poked their head[s] out the door?

"A: There was a lot of screaming going on, and this black guy, he jumped in the door.

"Q: And what happened after this black guy jumped in the door?

"A: He started pushing me. And I don't know, I told him, 'What do you want?'

"Q: Could you stand up and show the jury how he was pushing you?

"A: I don't know, both hands on my chest like this.

"Q: Do you know how far he pushed you?

"A: No.

"Q: Were you scared?

"A: Yes.

"Q: How scared?

"A: I don't know, guess I just kind of freaked out, I don't know.

"Q: Was there confusion?

"A: Yeah, mass confusion.

"Q: And what happened after this black person pushed on you?

"A: A scuffle, I guess is what you'd call it.
"Q: What do you remember of the scuffle?
"A: I remember grabbing him and swinging at him.
"Q: Okay. Could you stand up and try to show the jury what you remember grabbing?
"A: I kind of grabbed him right by there, and I swung at him.
"Q: Okay. Was there anything in your hand when you swung at him?
"A: Not that I recall.
"Q: And what happened next?
"A: I don't remember.
"Q: At some point you remember a knife being in your hand?
"A: Yeah, when I was going out the door.
"Q: And from the time that you grabbed the black person, do you remember very much?
"A: No.
"Q: When do you start remembering things again?
"A: When I seen this black guy, he stood up, and I looked, and he was bleeding. And I had a knife in my hand. And I seen Marc. And he said, 'Let's go.' And we left.
"Q: Did you know what had happened at that point?
"A: I assumed I stabbed him.
"Q: Did you know?
"A: No".

Jordan stated that when they arrived at Marc's house, Jordan "was freaked out." He "didn't know what had happened." He "was scared." He had never intended to kill anyone. He had not intended to pick a fight. In fact, he did not believe he had done anything to start the fight.

On redirect, Jordan was asked what scared him when Ward started pushing him. He responded:

"A: I don't know, I was just—he was bigger than me, you know. I have been on the bottom before.
"Q: Were you aware of what was going to happen to you?
"A: Yeah, nobody like to take an ass whipping.
"Q: Can you quantify or describe that fear?
"A: I can't explain it, I can't put it into words."

In refusing to instruct the jury on self-defense, the trial court divided the altercation into segments. The court indicated that if Ward had been stabbed while standing in the doorway or on the sidewalk, then a self-defense instruction might have been appropriate. According to all testimony, this altercation—from the time Jordan arrived to when Ward was stabbed—lasted a very

brief period of time. Jones testified that everything happened very fast—it only took seconds. Brandie agreed the incident took place very, very quickly. Deborah said the sequence of events happened very quickly, between 15 and 30 seconds.

We find no error. Here, Jordan caused the confrontation and was pushed out the door. Samuel Ward made no verbal threats of any kind to Jordan. Ward asked Jordan to leave the apartment and told him there would be no fighting. Ward did not make a fist; nor did it appear that he was going to strike Jordan in any manner other than to place his hands on Jordan's chest and push him out the door. At most, Jordan was pushed out the door after at least partially forcing his way into the apartment. Jordan immediately pulled a knife and attempted to cut or stab Ward. The only evidence of Ward's response is that Ward retreated across the yard in a circular path, always in a defensive posture. When Ward slipped and nearly fell, Jordan attempted, and nearly succeeded, in cutting Ward. Ward then ran from Jordan into the house and into the kitchen. According to the only eyewitness to the stabbing, Joseph Allen, Ward made it to the kitchen some three seconds before Jordan. Ward either hunted for a barbeque fork, or picked up a barbeque fork, to "protect himself" when Jordan ran into the room and ran into Ward. They both fell to the floor. When Jordan stood up, he pulled his knife out of Ward's chest.

The trial court was of the opinion that if Jordan would have been entitled to a self-defense instruction, it would have been if the killing had taken place while he was at the front door and was pushed out the door. If self-defense was justified at that point, the justification had ceased prior to the stabbing. While one is not required to retreat in Kansas, a person is not entitled to use a deadly weapon in order to pursue and ultimately to stab and kill an unarmed person who, if he was ever engaged in a fray, had withdrawn from it. Here, Ward withdrew and ran away, seeking shelter in, if not his own home, at least one he occupied most of the time as a guest.

Under the facts before us, the defendant was not entitled to a self-defense instruction. The trial court did not err in refusing to give a self-defense instruction.

## 2. Involuntary Manslaughter

The defendant argues that the jury should have been instructed on involuntary manslaughter under the theory that the killing occurred while he was acting in self-defense but that he acted with excessive force. Having determined the defendant was not entitled to a self-defense instruction, the trial court did not err in refusing to give an involuntary manslaughter instruction based on a self-defense theory.

## 3. Prior Crimes

The defendant filed a motion in limine, which included a request that the court prohibit the State's use of testimony about his prior juvenile conviction. The trial court denied the motion, ruling that the State could introduce into evidence that he had been adjudicated a juvenile offender for committing aggravated robbery and that this was the basis for the "bad blood" between Jones and the defendant. The court did prohibit the State from "elicit[ing] testimony regarding . . . the defendant being a suspect in firing a gun around a tavern on the 23rd day of July, 1990," and "elicit[ing] testimony regarding the incident in which the defendant shot his father, Butch Jordan, in self defense."

Jones testified he and Jordan grew up together and used to be friends, but had been "fighting for a long time." The "bad blood" between Jordan and Jones arose out of an incident that occurred several years earlier. Jordan robbed a store when he was spending the night with Jones. Jones did not realize Jordan had left the house and told the police that Jordan had been in the house the entire night. Jordan told Jones the truth after the police left. With the money, the boys purchased about $600 worth of cocaine. When Jones' mother noticed needle tracks on Jones' arms, she questioned him about it. Then she reported the incident to the police. When asked at the trial in this case whether he had told the police about the robbery, Jones said no.

As a result of his drug use and other problems, Jones spent a couple of years at the Youth Center at Larned. Jordan also spent a couple of years at the Youth Center at Larned. On cross-examination, Jones admitted he had been adjudicated a juvenile offender for burglary and theft prior to the incident involving Jordan's robbing the store and the two of them purchasing drugs.

The State argues the testimony regarding Jordan's juvenile record was needed to explain the ill will between the two. The State claims evidence of Jordan's juvenile record was needed to show his state of mind *"inclined* towards violence and aggression" (emphasis added) when he went to the apartment where Ward was killed and to establish motive and intent. Because the testimony related to motive, intent, or absence of mistake or accident, which were at issue, the State contends the testimony was admissible pursuant to K.S.A. 60-455. The statute provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-455 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

This court has set forth a three-part test to determine the admissibility of evidence of prior crimes: "[T]he trial court must: (1) determine it is relevant to prove one of the facts specified in the statute; (2) determine the fact is a disputed material fact; and (3) balance the probative value of the prior crime or civil wrong evidence against its tendency to prejudice the jury. [Citations omitted.]" *State v. Smith*, 245 Kan. 381, 389, 781 P.2d 666 (1989).

The second prong of the test is satisfied because both motive and intent were disputed material issues at trial.

Regarding the first prong of the test, the State argues the defendant's prior crime relates to motive and intent. "Motive is the moving power which impels one to action for a definite result. . . . Motive is that which incites or stimulates a person to do an action. [Citation omitted.]" *State v. Ruebke*, 240 Kan. 493, 502, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987). The State may introduce evidence of a prior crime to prove motive if such evidence is material. *State v. Myrick & Nelms*, 228 Kan. 406, Syl. ¶ 5, 616 P.2d 1066 (1980). Evidence of a prior crime is material to show why the defendant would have committed the alleged crime. See *Ruebke*, 240 Kan. at 503.

In *Ruebke*, the defendant was convicted of three counts of first-degree murder and three counts of aggravated kidnapping. On

appeal, one of the issues raised was whether the trial court erred in allowing the jury to hear evidence of his prior crimes. The defendant had pled guilty to two counts of misdemeanor theft and one count of felony theft. Because the only evidence of the defendant's guilt was circumstantial, the State needed to establish why the defendant would have committed the murders. The State claimed the defendant's need for money was his motive. The State contended the victims discovered the defendant as he was committing a theft and that the defendant committed the murders to prevent his identity from being discovered. This court upheld the admission of the defendant's prior crimes, stating: "Considering the needlessness of the murders, motive was relevant to establish why the defendant would have committed the crimes." 240 Kan. at 503.

Unlike *Ruebke*, the evidence here was not all circumstantial. There was no doubt Jordan stabbed Ward, but Jordan's motive and intent were at issue. If Jordan had stabbed Jones, evidence of Jordan's juvenile record would be relevant and material to explain the bad feelings between them. Assuming, arguendo, that evidence of Jordan's juvenile record established that he was mad enough to want to hurt Jones, can that evidence be introduced when a third person is killed? Jordan did not stab Jones; he stabbed Ward, a man he did not even know.

The trial court admitted the evidence of the prior robbery and use of cocaine to explain the hostile relationship between the defendant and Jones. The trial court gave a limiting instruction, limiting its use to establish "motive or intent, or absence of mistake or accident." The defendant argues the robbery and drug use evidence was irrelevant and immaterial, and any probative value was outweighed by the prejudicial effect.

We believe the evidence of prior crimes would have been admissible independent of K.S.A. 60-455 if the victim had been Jones. See, *e.g.*, *State v. Wood*, 230 Kan. 477, 638 P.2d 908 (1982). Here, the testimony was admissible to show Jordan's intent and motive in going to the apartment. The trial court appears to have allowed the testimony to show bad blood between the defendant and Jones. Much of the evidence would have been meaningless and highly confusing to the jury without some explanation

of why there was hostility between two of the principal actors in this tragedy.

Jones testified the defendant "broke in or robbed" a place of business, and later, in an answer that was unresponsive to the question asked, said "[w]hen [Jordan] robbed the store." Defense counsel raised a general objection, apparently that the answer was not responsive. The State admonished Jones to answer the question asked. No motion was made to strike the testimony or to admonish the jury to disregard the nonresponsive testimony.

Even more significant is that, at the pretrial hearing on the motion seeking to exclude evidence of prior crimes, the trial court stated:

"Assuming that at trial the relevance is established, as I believe it was at preliminary examination, then the motion in limine on [this issue] is not appropriate and will be denied. Of course [defense counsel] has a right to make an objection, because at that time [the State] might not have established the relevance."

Because no objection was made at trial when this evidence was introduced, the matter is not properly before us for review. See *State v. Bishop*, 240 Kan. 647, 659, 732 P.2d 765 (1987).

The State also argues that if we find the evidence was erroneously admitted, it was harmless error. The evidence was not dwelled on. The State did not mention prior crimes in closing argument, although mention was made of "bad blood" between the two. In fact, the State told the jury it did not "matter what [Jordan] went over there for, it's irrelevant. What matters is what happened after he got to [the Encinias apartment]. That's when the crime occurred, and that's what matters."

We agree with the State that had the issue been preserved by a proper objection, any error was, at most, harmless. See *State v. Cruitt*, 200 Kan. 372, 378-79, 436 P.2d 870 (1968).

### 4. Closing Argument

The defendant contends that the trial court erred in refusing to grant a new trial based on the prosecutor's improper and inflammatory remarks in closing argument. Jordan maintains the prosecutor's remarks were improper personal assertions of belief. The prosecutor first stated he believed he had convinced the jury beyond a reasonable doubt, to which comment the trial court sustained the defendant's objection. The prosecutor then referred

to Jordan's premeditation of the killing and stated, "[W]e don't know exactly when this thought process took place in the defendant's mind. But we know it did." Jordan's objection was overruled, and the prosecutor repeated his personal assertion that "[w]e know it did."

The prosecutor summed up his argument by giving his personal opinion that Jordan was a murderer:

"[Prosecutor]: . . . Folks, I'm finished. Police are finished. It's up to you. I can't go into the jury room with you, but that young man is a murderer.

"[Defense Counsel]: I object, Your Honor, it's a personal opinion, it's not allowed.

"COURT: Sustain the objection.

. . . .

"[Prosecutor]: And it's up to you now to—And if you want to live in a community where a person can kill another person—

"[Defense Counsel]: I object, Your Honor, it's an attempt to inflame the jury.

"COURT: Objection is overruled until I hear what he's got to say.

"[Prosecutor]: —can kill another person in the manner that this was conducted and excuse it because he had a few drinks, that's up to you.

"[Defense Counsel]: Object, Your Honor, he's asking—he's changing the court's instructions and trying to inflame the jury.

"COURT: I'm going to sustain the objection. The jury has heard the instructions, they'll have the instructions, and they'll know under what circumstances intoxication is a proper defense."

The prosecutor's argument was improper, both in expressing personal belief and in appealing to a juror's personal interests as a member of a community. The question is whether the record before us requires reversal as a result of the prosecutor's improper comments.

"The granting of a new trial is a matter of discretion and, as with all discretionary matters, will not be disturbed on appeal except by a showing of abuse of discretion." *State v. Bell*, 224 Kan. 105, 108, 577 P.2d 1186 (1978). "Discretion is abused only when no reasonable [person] would take the view adopted by the trial court; if reasonable [people] could differ as to the propriety of the action taken by the trial court, then it cannot be said the court abused its discretion. [Citation omitted.]" *State v. Galloway*, 238 Kan. 415, 418-19, 710 P.2d 1320 (1985).

The prosecutor's language with which the defendant first takes exception is:

"[Prosecutor]: When I made my opening statement I told you a story, I told you a story of the events of July 23rd. And I told you that we would present evidence that would convince you beyond a reasonable doubt that that story was true. And I believe we have done that. Tuesday and Wednesday of last week we put on evidence that I believe—"

At this point, the trial court sustained defense counsel's objection. The prosecutor apologized for saying, "I believe." The State suggests there is no reversible error because the trial judge sustained the objection and the prosecutor apologized.

Then, the prosecutor argued that the defendant's killing of Samuel Ward was premeditated.

"[T]he idea occurred to him, he decided to do it, and he did it. That's what premeditation is. Now, we don't know exactly when this thought process took place in the defendant's mind. But we know it did.
"[Defense Counsel]: I object, Your Honor. Again, he's injecting his personal belief.
"Court: Objection is overruled.
"[Prosecutor]: We know it did."

The prosecutor used the term "we" many times during his closing statements; he also used the term "you."

In addition to the appeal to the jurors' fear of lawlessness in the community, Jordan also argues that the trial court inconsistently and improperly ruled on statements regarding the manner in which Ward was stabbed:

"Defense counsel was not allowed to argue to the jury that the position of the wound and the lack of an upward thrust indicated no intent to kill. However, the lower court refused to sustain the defense objection to the exact same type of argument by the prosecutor when he argued that when one intends to kill someone one stabs the victim exactly where Mr. Jordan stabbed Mr. Ward."

Defense counsel stated, "I think you can imagine if you intended to kill somebody, that's not where you would stab them. In the movies they show coming up under the ribcage where .the heart would be, and they make an upward thrusting motion." The trial court sustained the prosecutor's objection, noting that "[w]e're not in the movies."

This argument has little merit.

Jordan argues that the prosecutor's comments are similar to those made in *State v. Majors*, 182 Kan. 644, 323 P.2d 917 (1958), in which the prosecutor appealed to the jury's fear of lawlessness in the community. The State maintains that the prosecutor's remarks in this case are not as objectionable as the remarks made by the prosecutor in *Majors*, who stated:

"[T]hank God we happened to get him—or Justine Anderson happened to get him in time. We have the jury, you have to determine whether he is going to be allowed to go out and repeat this same thing that he went through here and has already been proved as established by the evidence which was produced in this court room, and your home and my home is at stake. And I point out to you that everyone who got up here in his behalf and asked you to let him go out there and do that again—not a one of them have a home and a family, a wife and children to protect, here." 182 Kan. at 647.

Although the trial court admonished the prosecutor in *State v. Majors* the jury was not instructed to disregard the prosecutor's comments. This court found reversible error and cautioned that appeals to the self-interests of the jury are not proper and will not be condoned because such remarks prejudice the accused's right to a fair trial.

In *State v. Wilson*, 188 Kan. 67, 360 P.2d 1092 (1961), the defendant was on trial for rape and kidnapping, among other charges. Over the defendant's objection, the trial court allowed the prosecutor to read to the jury from a newspaper article about the Chessman rape case, one of the most controversial cases of the day (nationally and internationally). The article included a statement from the victim's mother that the rape "caused her [daughter] to lose her mind and life among normal human beings." 188 Kan. at 71. The trial court did remind the jury that this article was not evidence. This court found reversible error, stating: "The argument can only be deemed an appeal to prejudice and passion and an attempt to introduce facts not disclosed by the evidence. It was extremely improper and prejudicial to defendant's rights." 188 Kan. at 72.

In *State v. Warbritton*, 215 Kan. 534, Syl. ¶ 1, 527 P.2d 1050 (1974), this court ruled that "[i]mproper remarks made by the prosecuting attorney in his summation to the jury will not provide a basis for reversal where the jury has been instructed to disregard

the same, unless the remarks were so prejudicial as to be incurable."

In *State v. Perales,* 220 Kan. 777, 556 P.2d 172 (1976), the prosecutor told the jury in closing argument that unless the jury convicted the defendant, the defendant would commit the crime again. The trial court sustained the defendant's objection and instructed the jury " 'that what might happen in the future is pure conjecture and not to be considered.' " 220 Kan. at 780. This court found that the trial court's prompt instruction to the jury eliminated potential prejudice to the defendant.

In *State v. Zamora,* 247 Kan. 684, 689, 803 P.2d 568 (1990), the prosecutor told that jury that the defendant "has raped this victim once. If he is found not guilty, he will get away with it again." The trial court overruled the defendant's objection. This court found prejudicial error and noted that a general instruction to the jury—*i.e.,* statements and arguments by counsel are not evidence and should be disregarded—does not cure the error. This court also discussed whether the error was harmless: "[T]he reviewing court must be able to find that the error had little, if any, likelihood of changing the result of the trial. Such a belief must be declared beyond a reasonable doubt." 247 Kan. at 690.

In the case at hand, the prosecutor's general use of the term "we" does not constitute reversible error. In *State v. Bilby,* 194 Kan. 600, 603, 400 P.2d 1015 (1965), this court found that the following prosecutorial remarks did not exceed "fair argument."

" '[T]he prosecution would not have been carried on unless the state had felt the defendant was guilty—that the man who did it (the robber) was in the court room—that the state had carried the burden and as a result of its evidence the weight has shifted to the other side of the (counsel) table'— and so forth."

The prosecutor's statement that this "young man is a murderer" also does not constitute reversible error, pursuant to *Warbritton* and *Bilby.* The trial court sustained the defendant's objection and reminded the jury that the prosecutor's statement was not evidence and should be disregarded.

The prosecutor's last comment concerning whether the jurors would desire to live in a community in which a person can be excused for killing someone because he had a few drinks is a violation of the Model Rules of Professional Conduct. The trial

judge had an opportunity to prevent the statement and failed to do so. We do not, however, find the violation to be reversible error because at least four times during closing argument the trial judge instructed the jury that statements of counsel were not evidence and that the jury had heard the instructions, would have a copy of the instructions, and should follow them. In addition, the trial court sustained the objection to the remark. Defense counsel did not request a mistrial nor ask that the jury be admonished to disregard the remark. Based on the record before us, we do not find reversible error.

Affirmed.