(271 P.3d 1282)
No. 104,349

STATE OF KANSAS, *Appellee*, v. THOMAS JOSEPH STAWSKI, JR., *Appellant*.

Opinion filed March 23, 2012.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Steven L. Opat*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., MARQUARDT and LEBEN, JJ.

BUSER, J.: Thomas Joseph Stawski, Jr., was convicted of aggravated intimidation of a witness or victim, K.S.A. 21-3833(a)(1), and

criminal threat, K.S.A. 21-3419(a)(1). Stawski appeals the district court's granting of the State's motion to impose upward dispositional departure sentences for these convictions. He contends the district court erred when it ordered his commitment to the Secretary of Corrections when the presumptive sentence for both convictions was probation. In particular, Stawski claims there was insufficient evidence to prove that his offenses were motivated in whole or in part by the race or skin color of his victims. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

George Carter is a black man who, at the time of these proceedings, was a member of the Kansas National Guard. On October 1, 2008, he opened an envelope mailed to his family residence by an anonymous sender. Affixed to the envelope was an upside down "purple heart stamp." Inside the envelope were three sheets of paper which had content printed from one or more Internet websites.

One sheet of paper showed the picture of a man hanging by the neck from a scaffold. It was entitled, "Hanging Black Soldier." Below the picture was a reference to a "negro soldier" who purportedly "was accused of desertion and was hung" at Petersburg, Virginia, in 1864. Another sheet of paper showed 20 small photographs, many of which were of black soldiers being hung. These pictures had individual labels such as "1908 lynching 4 hanging" and "Claims of the Negro." The third sheet of paper showed an etching of a black man hanging from a scaffold. This etching was entitled, "A Negro Hung Alive by the Ribs to a Gallows." On each one of the three sheets of paper "KKK" was handwritten in large letters.

Carter suspected his neighbor, Stawski, of sending the anonymous mailing to his home because Carter had filed 16 complaints in 2008 with the local police department about Stawski's dogs running at large. In fact, Stawski was scheduled to appear for trial in the municipal court to answer one of those complaints in November 2008.

Carter also thought Stawski was responsible for the mailing because every time he called the police to complain about Stawski's

dogs, Stawski would respond in some manner which Carter considered provocative. After the first complaint, Stawski placed a beware of dog sign in his yard facing Carter's yard. The next time, Carter's wife found nails on their driveway. After another complaint, Stawski placed a simulated grave in his yard with a rest in peace sign. On the next occasion, Stawski placed a very large yellow sign in his yard stating, "[D]ogs don't bite, people do." That sign was changed after the next complaint to "Beware of people and dogs bite here."

Following an investigation by law enforcement officers, Stawski was identified as the sender of the offensive materials after DNA recovered from the envelope matched his DNA profile. As a result, Stawski was charged with aggravated intimidation of a witness or victim and criminal threat.

At the preliminary hearing, Carter testified he felt threatened upon receiving the mailing "[b]ecause it showed soldiers being hung, and it said the KKK on there, so I felt it was threatening either me, or all of [my family]." Carter's family also is black. According to Carter, the mailing "[m]ade me feel pretty scared, getting ready to deploy, and knowing my family is there, alone; not knowing what's going to happen to them. I felt that they were at a bigger risk than I was, in Iraq, to be, actually honest with you."

Later, under terms of a plea agreement, Stawski pled guilty to an amended information which charged aggravated intimidation of a victim, Carter, and criminal threat against Carter's wife. In return, the State dismissed another count of criminal threat against Carter and agreed not to refer the case for federal prosecution. The plea agreement included an acknowledgement that the State had filed a motion for an upward dispositional departure, but Stawski was free to request probation. After a thorough inquiry, the district court accepted Stawski's pleas and found him guilty.

Prior to sentencing, Stawski filed a motion for probation asserting he was "not a menace to society" and that society "would be better served by ordering him to probation, allowing him to maintain employment" and pay fines and court costs.

The State's motion for upward dispositional departure, however, alleged that Stawski's offenses were "motivated entirely or in part

by the race, color, and/or ethnicity, of the victims which is a statutory factor under [K.S.A. 21-4716(c)(2)(C)] in support of a departure." The State argued:

> "This case is not simply a dispute between two neighbors. If the defendant was angry at his neighbors and chose to 'send a letter,' he could have done so. However, the defendant chose to obtain pictures of black hanging soldiers knowing Mr. Carter was a black soldier. The defendant chose to write 'KKK' on the pictures knowing that referencing the Ku Klux Klan terrorizes most if not all African-Americans given the group's history of terrorism in this country. . . . He also chose to send [the pictures] anonymously which would heighten the victims' fear since they would have no way of knowing who was targeting them. . . . [Carter's] actions demonstrate[] he is willing to terrorize other people and target them based on their race or color."

At sentencing, the State and defense presented several witnesses. In particular, Carter testified:

> "I came home, opened up that first letter, and saw KKK at the top, followed by all the little, small pictures of hanging black soldiers. I just could not believe my eyes . . . . This is something that, regardless how many times you've heard people being in a situation, you can never imagine that until you physically feel it for yourself. The rest of the time I was at home, I didn't sleep at night. Scared. . . . It was very disturbing for me, my family."

Stawski testified on his own behalf. At the outset, he stated, "I'd like to apologize to everybody for my mistake." He related the difficulties he had encountered in containing his dogs within his yard. In particular, Stawski denied that any signs on his property were directed at Carter. Stawski concluded, "Only thing, I got mad, and I made a mistake, and I paid for it dearly. . . . But nothing with the prejudice thing. It's just—I made a mistake. I got mad and I did it."

The district court imposed the standard terms (after upward departure) of 18 months' imprisonment for aggravated intimidation of a witness and 6 months' imprisonment for criminal threat. Both sentences were to be served concurrently with each other. Given Stawski's overall criminal history classification of I and the Kansas Sentencing Guidelines, the presumptive sentences for both felony offenses (severity levels 6 and 9, respectively) were probation. See K.S.A. 2008 Supp. 21-4704.

The sentencing court, however, granted the State's upward dispositional departure motion on grounds the offenses were motivated entirely or in part by race or skin color. In making its ruling, the sentencing court relied on the testimony presented at sentencing, the preliminary hearing, and the envelope and its contents which were admitted as exhibits.

In granting the State's upward dispositional departure motion, the sentencing judge stated:

"The dog issue is secondary. . . . Mr. Carter wasn't a victim of running dogs . . ., Mr. Carter was a victim of what seems to be pretty invidious discrimination, to the Court. The aggravating factor, of course, that does apply, is number (c) of 21—K.S.A. 21-4716(c)[(2)(C)] which states: The Court should consider in determining whether substantial and compelling reasons for departure exists, and it lists about seven or eight factors the Court may consider. The one that the Court will consider in this case is that the offense was motivated by the defendant's belief or perception entirely or in part of the race, color, religion, et cetera. . . .

"Now, what occurred here was something that cannot be tolerated in this society.

"I know you know that, Mr. Stawski."

Stawski replied, "Yes, sir."

Stawski was ordered to serve his sentences with the Kansas Department of Corrections. He filed a timely appeal.

## DID SUBSTANTIAL AND COMPELLING REASONS EXIST FOR GRANTING THE UPWARD DISPOSITIONAL DEPARTURE SENTENCES?

For the first time on appeal, Stawski contends the sentencing court erred in ruling that his offenses were motivated entirely or in part by the Carter family's race or skin color. As a result, Stawski claims there was not a substantial and compelling reason for granting the upward dispositional departure sentences.

Appellate review of a departure sentence involves a mixed standard:

"Generally, a reviewing court first examines the record to see whether there is substantial competent evidence in support of the sentencing court's articulated reasons for granting a departure. The appellate court then determines, as a matter of law, whether the sentencing court's reasons for departure are substantial and

compelling reasons justifying a deviation from the presumptive sentence defined by the legislature." *State v. Blackmon*, 285 Kan. 719, Syl. ¶ 1, 176 P.3d 160 (2008).

K.S.A. 21-4716(a) authorizes a district court, under appropriate circumstances, to depart from a presumptive sentence of probation and impose an upward dispositional departure sentence of imprisonment. A departure is permitted when the sentencing court finds "substantial and compelling reasons for the departure." K.S.A. 21-4716(a). In the determination of "whether substantial and compelling reasons for a departure exist," K.S.A. 21-4716(c)(2), the sentencing court may consider a nonexclusive list of aggravating factors, including that "[t]he offense *was motivated entirely or in part by the race, color*, religion, ethnicity, national origin or sexual orientation *of the victim.*" (Emphasis added.) K.S.A. 21-4716(c)(2)(C). The two statutory aggravating factors at issue in the present case are the victims' race and skin color.

Stawski claims error because "[a]lthough the *means* Mr. Stawski used to threaten and/or intimidate Mr. Carter [were] racially offensive, there was no substantial and competent evidence that Mr. Stawski's *motivation* to commit the crime was in any way related to race." (Emphasis added.) He argues his motivation for the crimes was solely retaliation as a result of Carter's complaints that Stawski's dogs were running at large. According to Stawski, race may have factored into the means of the intimidation, but it did not evidence his motivation as to why he committed the crimes.

Stawski also argues

"[t]he images were effective in intimidating Mr. Carter because he was a black soldier and the first photograph was of a black soldier being hung. Yet, it would be absurd to say that Mr. Stawski's motivation for the crime was, even in part, because Mr. Carter was a soldier. Similarly, all of the images were of black men. But there is no indication that Mr. Stawski was motivated by a gender bias against men. Accordingly, that Mr. Stawski used images of men the same race as Mr. Carter does not mean he was motivated to do so because of Mr. Carter's race."

The State counters that the photographs depicting black soldiers being hung with the letters "KKK" handwritten next to them exemplify the why or motivation behind the crime because the anonymous photographs would not have conveyed the same meaning to a white person. According to the State, this "is the very reason

why someone like Stawski would do it, and hence the *means* are demonstrative of the *motivation* 'entirely or in part . . . .' " (Emphasis added.)

At the outset, K.S.A. 21-4716(c)(2)(C) clearly provides that a defendant's motivation for committing an offense is not required to be exclusively based on a victim's race or skin color. The plain meaning of the words "entirely or *in part*" (emphasis added) explicitly allows a sentencing court to consider if any aspect or portion of the defendant's motivation was based on race or skin color.

Moreover, as a general rule of statutory construction, we give common words their ordinary meaning. *State v. Urban*, 291 Kan. 214, 216, 239 P.3d 837 (2010). The word "motivation" is commonly understood as "something within a person (as need, idea, organic state, or emotion) that incites him to action." Webster's Third New International Dictionary 1475 (1971). This common definition is consonant with the legal definition of "motive": "Motive is the moving power that impels one to action for a definite result. Motive is that which incites or stimulates a person to do an action." *State v. Jordan*, 250 Kan. 180, Syl. ¶ 8, 825 P.2d 157 (1992).

Our review of the evidence shows that a part of Stawski's motivation for committing aggravated intimidation of a victim against Carter and criminal threat against Carter's wife was an attempt by Stawski to deter Carter from the filing of complaints for dogs running at large and assisting the city in the prosecution of those complaints. There was, however, other evidence to support the sentencing court's finding that "[t]he dog issue is secondary."

Substantial competent evidence showed that Stawski's offenses also were motivated in part by the Carters' race and skin color. In this regard, both of Stawski's convictions shared a common element—a threat to commit violence. In particular, aggravated intimidation of a victim requires an act "accompanied by an expressed or implied threat of force or violence," K.S.A. 21-3833(a)(1), and criminal threat requires communication of a threat "[t]o commit violence . . . in reckless disregard of the risk of causing such terror," K.S.A. 21-3419(a)(1).

Kansas caselaw is replete with the typical ways that criminal defendants have threatened to commit violence against their victims.

Usually, the threats have involved ordinary, spoken or written words or gestures that simply described the threatened act of violence. *State v. Woolverton*, 284 Kan. 59, 61, 159 P.3d 985 (2007) (defendant told victim, " 'I will [expletive deleted] kill you' "); *State v. Cope*, 273 Kan. 642, 648, 44 P.3d 1224 (2002) (defendant said he would " 'whack as many people as possible' " in attack on courthouse); *State v. Quinones*, 42 Kan. App. 2d 48, 50, 208 P.3d 355 (2009), *rev. denied* 290 Kan. 1101 (2010) (defendant made slashing motion across her throat while witness was testifying against defendant's son); *State v. Hoskins*, No. 99,802, 2009 WL 2499274, at * 1 (Kan. App. 2009) (unpublished opinion) (defendant told victim he would shoot her and her four children if she did not drop charges). In short, these threats of violence were characteristically generic, nonexclusive, and universally applicable to victims regardless of their race or skin color.

This case is different. Stawski did not communicate an ordinary, run-of-the-mill threat to commit violence. Here, the threat to commit violence was unspoken, unwritten, and uncommon. It consisted of three pieces of paper containing images upon which were scrawled three capital letters. Yet, it sent an unmistakable and powerful message—a message to commit violence uniquely and especially understood by the Carters and members of their race with similar skin color. In short, the threat of violence communicated by Stawski revealed, in part, a motivation that had less to do with dogs running at large and more to do with racism.

As the Nebraska Supreme Court has written:

"The Ku Klux Klan's history and notoriety give it, and its symbols, influence and meaning greatly disproportionate to its remaining membership. The Ku Klux Klan has been characterized as ' " '[t]he world's oldest, most persistent terrorist organization.' " ' There is little doubt that the Ku Klux Klan's main objective remains to establish a racist white government in the United States. The Ku Klux Klan, like the burning cross that is its most dramatic and visible sign, is a symbol of organized violence, physical as well as verbal, directed against blacks. '[N]o single group more starkly demonstrates the endurance of dark social forces in the United States—racism, religious bigotry, extralegal vigilantism, moral authoritarianism—than the Klan, a hooded, secret order now well into its second century of existence.' " *State v. Henderson*, 277 Neb. 240, 256-57, 762 N.W.2d 1 (2009).

It is an understatement to observe that Ku Klux Klan activities have resulted in lawlessness and terrorism against black persons in the United States. Justice Clarence Thomas, for example, has described the Klan "as a terrorist organization, which, in its endeavor to intimidate, or even eliminate those it dislikes, uses the most brutal of methods." *Virginia v. Black*, 538 U.S. 343, 389, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003) (Thomas, J., dissenting). These brutal methods have included murders, bombings, beatings, shootings, stabbings, and mutilations. 538 U.S. at 355.

In his brief, Stawski acknowledges that he used "one of the most intimidating images to a black man: a black man being hung alongside the invocation of the Ku Klux Klan." In essence, Stawski concedes the unique and powerful relevance the images and the "KKK" references had to the Carters and other black persons—a fear of physical violence born of the historical notoriety of the KKK in fomenting racism in the United States.

The unique and purposeful means by which Stawski chose to communicate his threats of violence revealed, at least in part, his underlying motivation for those threats. As the sentencing court found, Stawski engaged in "pretty invidious discrimination." Accordingly, we conclude there was substantial competent evidence to support the sentencing court's finding that Stawski's offenses were motivated in part by the statutory factors of the Carters' race and color. See K.S.A. 21-4716(c)(2)(C).

Finally, we consider whether the sentencing court's reasons for departure were substantial and compelling reasons justifying a deviation from the presumptive sentences in this particular case. See *State v. Martin*, 285 Kan. 735, Syl. ¶ 1, 175 P.3d 832 (2008). "The term 'substantial' refers to something real and of substance and not imagined or ephemeral, while the term 'compelling' implies that the court is forced by the facts of a case to go beyond what is ordinary or to leave the status quo." *State v. Rodriguez*, 269 Kan. 633, 646, 8 P.3d 712 (2000).

Ordinarily, Stawski's offenses would have resulted in presumptive sentences of probation. Two considerations, however, convince us that the sentencing court did not err in granting the upward dispositional departure sentences of imprisonment.

First, given the racist nature of the offenses, Stawski caused great emotional distress to the Carters. Carter testified that he was scared. He also described the physical manifestation of this fear—difficulty with sleeping. Carter's consternation was heightened because he was scheduled for deployment to Iraq with the Kansas National Guard. He testified that leaving his family alone under the circumstances was "very disturbing for me, my family." Moreover, as emphasized by the State, Stawski failed to demonstrate any appreciation for the serious emotional suffering he caused the Carter family.

Second, although Stawski apologized for making "a mistake," his denial that the offenses were related to "the prejudice thing" failed to show a simple understanding that his threats—given their racist context—were especially heinous. As the sentencing judge concluded, "[W]hat occurred here was something that cannot be tolerated in this society."

Given the totality of the evidence in this case, we hold the sentencing court's reasons for departure were both substantial and compelling. Accordingly, the sentencing court did not err is granting the State's motion for imposition of upward dispositional departure sentences of imprisonment.

Affirmed.