277 Neb. 240 (2009)
STATE OF NEBRASKA AND THE NEBRASKA STATE PATROL, APPELLEES,
v.
ROBERT HENDERSON AND THE STATE LAW ENFORCEMENT BARGAINING COUNCIL, APPELLANTS.
No. S-07-010.
Supreme Court of Nebraska.
Filed February 27, 2009.
Vincent Valentino for appellants.
Jon Bruning, Attorney General, and Tom Stine for appellees.
John E. Corrigan, of Dowd, Howard & Corrigan, L.L.C., and Lawrence P. Schneider, of Knaggs, Harter, Brake & Schneider, P.C., for amicus curiae National Troopers Coalition.
Aaron Nisenson, of International Union of Police Associations, AFL-CIO, and Jane Burke, of Keating, O'Gara, Nedved & Peter, P.C., for amicus curiae International Union of Police Associations, AFL-CIO.
David J. Kramer and Quinn Vandenberg, of Baird, Holm, L.L.P., and Clare Pinkert, Steven C. Sheinberg, Steven M. Freeman, and Deborah R. Cohen, of Anti-Defamation League, for amicus curiae Anti-Defamation League.
WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and SIEVERS, Judge.
GERRARD, J.
From its very inception, the State of Nebraska has been founded upon principles of equality and tolerance that the Ku Klux Klan, from its very inception, has used violence and terror to oppose. When Robert Henderson, a veteran trooper of the Nebraska State Patrol, joined the Ku Klux Klan, he voluntarily associated himself with an organization that is expressly opposed to Nebraska's founding principles. To reinstate Henderson as a sworn officer of the Nebraska State Patrol would violate this state's explicit, well-defined, dominant public policy. For that reason, we affirm the district court's decision to vacate an arbitration award in Henderson's favor.

BACKGROUND
On November 1, 2005, an internal affairs investigator for the Nebraska State Patrol was informed that a member of the State Patrol might be participating in online discussions at a members-only Web site associated with the Ku Klux Klan. An investigation was commenced which revealed that appellant Henderson had joined the Knights Party, a Ku Klux Klan-affiliated organization, and participated in online discussions in a Knights Party online discussion forum. The investigating officer found that Henderson's membership reflected negatively on the State Patrol and brought the State Patrol into disrepute.
Henderson was fired for his activities, and the state Law enforcement bargaining council (SLEBC) filed a grievance on Henderson's behalf, pursuant to the relevant collective bargaining agreement (CBA). When the grievance was not resolved, it was submitted to binding arbitration pursuant to the CBA. The arbitrator determined that the firing violated the CBA, because, according to the arbitrator, the State Patrol had violated Henderson's constitutional rights, and did not have "just cause" for terminating his employment under the CBA. The arbitrator ordered that Henderson be reinstated to his previous duties. The State Patrol, pursuant to Nebraska's Uniform Arbitration Act,[1] filed an application in the district court to vacate the award.[2] The district court granted the application to vacate the award, finding that the award violated "a well-defined and dominant public policy of this state." Henderson and SLEBC appeal.

ASSIGNMENT OF ERROR
Henderson and SLEBC assign, restated and consolidated, that the district court erred in vacating the arbitrator's award and instead should have confirmed the award.
We note the State Patrol's argument that Henderson lacks standing to prosecute this appeal. But while the original notice of appeal in this case was filed by Henderson, an amended notice of appeal was timely filed on behalf of Henderson and SLEBC. The State Patrol concedes that SLEBC has standing to appeal. Therefore, we do not address Henderson's standing, because all the issues raised by him have also been raised by SLEBC.

STANDARD OF REVIEW
[1] In reviewing a district court's decision to vacate, modify, or confirm an arbitration award under Nebraska's Uniform Arbitration Act, an appellate court is obligated to reach a conclusion independent of the trial court's ruling as to questions of law. However, the trial court's factual findings will not be set aside on appeal unless clearly erroneous.[3]

ANALYSIS

NATURE AND PRINCIPLES OF ARBITRATION
[2] Arbitration is not a judicial proceeding; it is purely a matter of contract.[4] In this case, the CBA between the State Patrol and SLEBC provides that if an employee's grievance is not satisfactorily resolved, it may be referred to arbitration. The parties in this case do not dispute that Henderson's grievance was properly submitted to arbitration.
[3] Arbitration in Nebraska is governed by the Federal Arbitration Act if it arises from a contract involving interstate commerce[5]; otherwise, it is governed by Nebraska's Uniform Arbitration Act.[6] In this case, there is no claim that the transaction involved interstate commerce, so Nebraska law applies. We note, however, that because the applicable provisions of the Uniform Arbitration Act and the Federal Arbitration Act are similar, we look to federal case law explaining the scope of judicial review of arbitration awards.
We have explained that judicial review of an arbitrator's award is severely circumscribed.[7] Appellate review of an arbitrator's award is necessarily limited because "'to allow full scrutiny of such awards would frustrate the purpose of having arbitration at allthe quick resolution of disputes and the avoidance of the expense and delay associated with litigation.'"[8] Strong deference is due an arbitrative tribunal.[9]
[4] And when parties agree to arbitration, they agree to accept whatever reasonable uncertainties might arise from the process.[10] Because the parties to a collective bargaining agreement have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and the meaning of the contract that they have agreed to accept.[11] Courts do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.[12] In other words, a court may not overrule an arbitrator's decision simply because the court believes that its own interpretation of the contract, or the facts, would be the better one.[13]
Therefore, in this case, we do not revisit the arbitrator's factual findings, interpretation of the CBA, or ultimate conclusion that the State Patrol violated the CBA in its termination of Henderson's employment. Nor do we revisit the arbitrator's discussion of constitutional issues, although his conclusions on those issues are highly suspect.[14] The State Patrol does not contend, nor is there any basis in the record to conclude, that any of the statutory bases under the Uniform Arbitration Act for vacating an arbitration award are applicable in this case.[15] Instead, the issue in this appeal is whether the district court correctly determined that the arbitrator's award can be vacated, as the State Patrol contends, because reinstating Henderson to the State Patrol would be contrary to public policy.
In that regard, we note that the sole matter submitted to the arbitrator for disposition was, "Did the Nebraska State Patrol violate the [CBA] or its own operating procedures or policies when it disciplined the Grievant, . . . Henderson, on March 15, 2006? If so, what shall be the remedy?" The issue submitted for arbitration was consistent with the CBA, which defines a "grievance" subject to arbitration as "a claimed breach, misinterpretation, or misapplication of the terms of this Agreement." The arguments of the parties, and the decision of the arbitrator, touch on constitutional issues. But we view those issues, in light of the scope of the CBA and arbitration agreement, to be subsumed in the question whether the CBA was violatedand thus in the question whether the remedy for that violation violates public policy. In other words, we do not view this case as presenting a civil rights claim and do not address what remedy, if any, might be appropriate for any alleged violation of Henderson's constitutional rights. We note that compensatory damages might be available to a plaintiff injured by a breach of contract even when specific performance of the contract would violate public policy.[16] But the only issue before the arbitrator in this case was the application of the CBA, and the only issue before this court is whether the arbitrator's remedy for violation of the CBA is enforceable.

PUBLIC POLICY EXCEPTION
We have not previously addressed whether an arbitration award, under the Uniform Arbitration Act, can be vacated by a court on public policy grounds. The State Patrol argues that we should adopt such a doctrine, using the reasoning of the U.S. Supreme Court in cases such as W. R. Grace & Co.[17]; Misco, Inc.[18]; and Eastern Associated Coal Corp. v. Mine Workers.[19]
In W. R. Grace & Co., an arbitrator found that an employer had unlawfully laid off employees in violation of a collective bargaining agreement, despite the fact that the employer had been attempting to comply with a conciliation agreement with the Equal Employment Opportunity Commission. The employer sought to vacate the arbitrator's award on the ground that it violated public policy. Although the U.S. Supreme Court rejected the claim that the arbitrator's interpretation of the collective bargaining agreement violated public policy, the Court recognized:
[A] court may not enforce a collective-bargaining agreement that is contrary to public policy. . . . If the contract as interpreted by [the arbitrator] violates some explicit public policy, we are obliged to refrain from enforcing it.. . . Such a public policy, however, must be well defined and dominant, and is to be ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests."[20]
The Court extended that reasoning in Misco, Inc.,[21] in which a machine operator had been fired after marijuana was found in his home and in his vehicle parked in his employer's parking lot. An arbitrator ordered the employee reinstated with backpay, reasoning that the evidence did not establish that he had used or possessed marijuana on company property, in violation of company policy. The federal district court declined to enforce the award, and the Fifth Circuit affirmed the district court's conclusion that "reinstatement would violate the public policy `against the operation of dangerous machinery by persons under the influence of drugs or alcohol.'"[22]
The Court explained that "[a] court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy."[23] That doctrine derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act, and the doctrine is further justified by the observation that the public's interests in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements.[24] In the common law of contracts, this doctrine has served as the foundation for occasional exercises of judicial power to abrogate private agreements.[25]
But, the Court cautioned, while a court may not enforce a collective bargaining agreement that is contrary to public policy, a court's refusal to enforce an arbitrator's interpretation of a collective bargaining agreement "is limited to situations where the contract as interpreted would violate `some explicit public policy' that is `well defined and dominant, and is to be ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests."'"[26] Thus, the Court explained,
[t]wo points follow from our decision in W. R. Grace.[27] First, a court may refuse to enforce a collective-bargaining agreement when the specific terms contained in that agreement violate public policy. Second, it is apparent that our decision in that case does not otherwise sanction a broad judicial power to set aside arbitration awards as against public policy. Although we discussed the effect of that award on two broad areas of public policy, our decision turned on our examination of whether the award created any explicit conflict with other "laws and legal precedents" rather than an assessment of "general considerations of supposed public interests." . . . At the very least, an alleged public policy must be properly framed under the approach set out in W. R. Grace,[28] and the violation of such a policy must be clearly shown if an award is not to be enforced.[29]
Based on that holding, the Court concluded:
[T]he formulation of public policy set out by the Court of Appeals did not comply with the statement that such a policy must be "ascertained `by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" . . . The Court of Appeals made no attempt to review existing laws and legal precedents in order to demonstrate that they establish a "well-defined and dominant" policy against the operation of dangerous machinery while under the influence of drugs. Although certainly such a judgment is firmly rooted in common sense, we explicitly held in W. R. Grace[30] that a formulation of public policy based only on "general considerations of supposed public interests" is not the sort that permits a court to set aside an arbitration award that was entered in accordance with a valid collective-bargaining agreement.[31]
The Court further explained that even if the Fifth Circuit's formulation of public policy was accepted, no violation of that public policy had been shown, because the marijuana found in the employee's home and car did not establish that his reinstatement violated a public policy against the operation of dangerous machinery by persons actually under the influence of drugs. That conclusion, the Court reasoned, rested on assumptions that were insufficient to support vacating the award and inconsistent with the factual findings made by the arbitrator.[32]
The Court elaborated upon those principles in Eastern Associated Coal Corp.,[33] in which the lower courts had refused to vacate an arbitration award ordering reinstatement of a truck-driver who had tested positive for marijuana the court framed the issue presented in the case as "not whether [the employee's] drug use itself violates public policy, but whether the agreement to reinstate him does so."[34] The Court agreed with the employer, "in principle, that courts' authority to invoke the public policy exception is not limited solely to instances where the arbitration award itself violates positive law."[35] But the Court reiterated that the public policy exception is narrow and must satisfy the principles explained in W. R. Grace & Co. and Misco, Inc.[36] And the Court reasoned that in the case before it, the employee's reinstatement was not contrary to public policy, because it was not unlawful despite a detailed statutory and regulatory scheme that represented a careful determination of public policy by the legislative and executive branches.[37]
[5] Although this court has not previously recognized the public policy exception to the enforcement of arbitration awards, the basic common-law contract principles upon which the Court relied in Misco, Inc.[38] are well established in Nebraska,[39] and other jurisdictions to have considered the question have taken an approach consistent with the U.S. Supreme Court's.[40] We agree with those jurisdictions and likewise hold that a court may refuse to enforce an arbitration award that is contrary to a public policy that is explicit, well defined, and dominant.[41] Such a public policy must be ascertained by reference to laws and legal precedents, not from general considerations of supposed public interests, but the arbitration award need not itself violate positive law to be unenforceable as against public policy.[42]
With that established, we turn to a consideration of Henderson's relationship with the Ku Klux Klan and what it represents, and the Nebraska public policy concerns that relationship implicates.

HENDERSON'S AFFILIATION WITH KU KLUX KLAN
Henderson joined the Ku Klux Klan in 2004. In 2003, Henderson's wife had left him in favor of a Hispanic man, and an action for dissolution of marriage was filed. This led Henderson, in June 2004, to pay a $35 membership fee to join the Knights Party. Henderson admitted that the Knights Party is essentially the same entity as the Ku Klux Klan. A Knights Party application form, obtained by the State Patrol investigation, explained the Knights Party as follows:
The Knights Party is always looking for good men and women to associate with and work toward White Christian Revival.
. . . The Knights' Party is not a secret society but rather a political movement, an alternative from the November Criminals of the Republican Party and Democrat Party.
. . .
We are a political party building a strong foundation nation wide. We do not run candidates at this time so that all financial resources can be invested into the grass roots level  therefore we do not fall under the federal political party guidelines. Unlike the other political parties where they have to make public the names of contributors and associates. We do not. Your Klan association is kept strictly confidential.
We are a Christian organization and in spite of what enemies of the Klan say or in spite of those who appear on talk shows who claim they are Klansmen and Klanswomen, we are nonviolent and won't allow such behavior. We are not opposed, however to self-defense only aggressive behavior.
On the application form, the applicant was asked to attest to the following:
I am white and not of racially mixed descent. I am not married to a nonwhite. I do not date nonwhites no[r] do I have nonwhite dependents. I believe in the ideals of Western Christian civilization and profess my belief in Jesus Christ as the Son of God.
I understand that The Knights Party is legal and law abiding and that I will never be asked to commit an unlawful act.
....
I agree to follow the guidelines as set by headquarters to the best of my ability and to do what I am able to promote the interests of The Knights Party and its ultimate goal of political power and White Christian Revival.
....
I understand I will be expected to be honest, ethical, sacrificing, dedicated, disciplined, and loyal.
And an attached letter from Knights Party National Director Thomas Robb, welcoming the applicant to the Knights Party, explained:
The Knights prides itself on being the most professional and active pro-white movement in America and we also have Klansmen and Klanswomen throughout the world. Across the nation we are recognized as the most devoted and experienced movement in the struggle for White rights, White Pride and White Power! . . .
. . . .
Again, we welcome you as you start out on the journey to Knighthood. We pray that your decision to take this very important step was a decision based upon your desire to actively promote this most noble cause and not one of mere amusement. We take the problems that our people face very seriously and wish to Knight only the most dedicated and unselfish of individuals. We believe that you can be this type of person; a Klansman of purpose, a Klansman of dedication, a Klansman of sacrifice, a Klansman of humility, and a Klansman of loyalty. You joined the movement to make a difference. We trust you will not let our people, our faith, or our nation down. You have been given a great opportunity to make a real difference for our people. Let's make the most of it.
White Victory!
/s/
Thomas Robb
(Emphasis in original.)
As a result of his application and payment of the fee, Henderson was issued a Knights Party membership card. The card read, in part:
I pledge my loyalty. I will work for the preservation and protection of the White race. I understand Jesus Christ is our foundation and that we are not a secret army but men and women who proclaim the need of our people to put the true Christian faith in all areas of society, whether economic, judicial, social, educational, scientific, or political.
Henderson, under the user name "White knight in NE," posted messages in a Knights Party online discussion forum.[43] In a September 20, 2005, message, Henderson stated: "I'm the new guy from Nebraska. Just want to say hi. Hope everyone is doing good. Give me hints how this works. THANKS !!!!" And a few minutes later, Henderson posted the following:
I have been in law enforcement 23 yrs. My fiancee has been working in TV news locally 8yrs. A recent hired black anchor ie: they need people of color on the news desk, has been trying to get real friendly with her. But she has told him to leave her alone. She even complained to the higher up's. They told her not to cause trouble. So, I contacted him, the black anchor and told him the same thing leave her alone. I was very polite and kind about it. He complained to my Capt. that I was harrassing him. I was found not to be thru and investigation done by IA. But I was told to not contact him any more by my Capt. My fiancee went to an atty. that specialize's in these matters. She was told the black card wins all the time. So she probably should start looking for another job, or just not say anything to anyone at work.
It is pretty bad when a person can not even complain about these things and they are told to stay away or not say anything. Over my 23 yrs in my job this sort of thing has been getting worse, not only at work, but also with suspects. Whites are losing there rights slowly. It's sad. I pray about it. I hope my prayers get answered. White knight in Ne.
Later that day, Henderson posted again: "Can someone put me in touch with others in the omaha, ne area that have the same beliefs that I do. God Country and Race. Your White Knight in Ne." After a response from another member suggested that Henderson contact "Headquarters," Henderson replied: "Thank you for your reply. I will contact them ie: HQ. I just feel like I'm fighting a up hill battle by myself here in NE. God bless. Your White Knight in Ne." A few days later, Henderson posted:
I guess I was stupid when I asked to be put in touch with other members in Nebraska. I know everyone must be discreet. I especially need to be discreet because of my job ie: law enforcement. But if anyone wants to contact me, being discreet. You can contact me by e-mail [e-mail address redacted] or phone [telephone number redacted]. I'm in Omaha. If no one contacts me because or privacy I fully understand. Your White Knight in Ne.
P.S. I especially would like to know other law enforcement people. As we would have alot in common.
Henderson reported that no one responded to his request for contact, and there is no evidence of any further participation by Henderson in Knights Party discussion or activities. Henderson resigned his membership in the Knights Party in an e-mail sent February 20, 2006after the State Patrol investigation had commenced, after the State Patrol investigator had concluded that the allegations against Henderson were well founded, and the day before the internal affairs conduct and procedures meeting that resulted in a recommendation that Henderson's employment be terminated.

KU KLUX KLAN
The Ku Klux Klan was founded in Pulaski, Tennessee, in 1865 or 1866, by former officers of the Confederacy.[44] It began as a social fraternity of pranksters, but was quickly transformed into a terrorist organization aimed to promote and preserve white supremacy.[45] In the post-Civil War South, under the leadership of a former Confederate general, Nathan Bedford Forrest, the Ku Klux Klan became a counterrevolutionary organization that "whipped, shot, hanged, robbed, raped, and otherwise outraged Negroes and Republicans across the South in the name of preserving white civilization."[46] The movement was from the start, and still is, highly decentralized, but "[t]he overriding purpose of the Ku Klux movement, no matter how decentralized, was the maintenance or restoration of white supremacy in every walk of life."[47]
The Ku Klux Klan was officially "disbanded" by Forrest when even he proved unable to control it, but local units continued to operate until sent into hiding by federal troops[48] empowered by federal legislation specifically enacted to combat the Ku Klux Klan.[49] It reorganized in 1915 and was extraordinarily successful due to a nascent civil rights movement, urbanization, northern migration of blacks, and immigration.[50] The movement fragmented again after the Second World War but gained new strength in the wake of Brown v. Board of Education[51] and in opposing the growing civil rights movement.[52] Between 1955 and 1965, the Ku Klux Klan or Ku Klux Klan sympathizers perpetrated more than 200 bombings and murdered 40 civil rights workers.[53] Although the Ku Klux Klan's threat has waned since, it has recently begun to regain strength by advancing an anti-immigrant message, much as it did during its heyday in the 1920's, when its meteoric rise was fueled by fear of Catholic European immigrants.[54] Over its long history, the Ku Klux Klan has always managed to rebuild.[55]
Nebraska has not been immune to the Ku Klux Klan's influence. The Ku Klux Klan began actively recruiting members in Nebraska in 1921.[56] Soon, the Ku Klux Klan claimed 45,000 members in Nebraska, and public demonstrations, parades, and cross burnings grew common.[57] The Ku Klux Klan was vigorous in its campaigns against blacks, Jews, foreigners, Catholics, and women suffragists.[58] Early resistance from key political officials and newspapers, however, blunted the Ku Klux Klan's appeal in Nebraska, and "although it would linger in a number of communities well into the 1930s, [it] soon faded from the public scene."[59] But not before it divided communities with anger and hostility and engendered fear of violence among those that it targeted for exclusion.[60]
The Ku Klux Klan's history and notoriety give it, and its symbols, influence and meaning greatly disproportionate to its remaining membership. The Ku Klux Klan has been characterized as "`"[t]he world's oldest, most persistent terrorist organization."'"[61] There is little doubt that the Ku Klux Klan's main objective remains to establish a racist white government in the United States.[62] The Ku Klux Klan, like the burning cross that is its most dramatic and visible sign, is a symbol of organized violence, physical as well as verbal, directed against blacks.[63] "[N]o single group more starkly demonstrates the endurance of dark social forces in the United Statesracism, religious bigotry, extralegal vigilantism, moral authoritarianismthan the Klan, a hooded secret order now well into its second century of existence."[64]
Nor is there any doubt that the Knights Party is heir to the historical Ku Klux Klan. The Knights Party attempts to make itself respectable by presenting itself as representing Christian family values, and this approach has made it one of the largest traditional Ku Klux Klan groups operating today.[65] But the record establishes that the Knights Party, while it purports to discourage violence, expressly claims to be the Ku Klux Klan founded in Pulaski over 140 years ago and the Ku Klux Klan that marched in Washington, D.C., in the 1920's. The Knights Party invokes and claims the legacy of Nathan Bedford Forrest. The Knights Party uses the ceremonial robes and Celtic cross that have traditionally represented the Ku Klux Klan.[66] And the Knights Party invokes the same political views, declaring, "God gave the entire earth to be the white man and woman's domain. That is our purpose in being here; to subdue and rule. Under our Christian guidance, all races will lead a much happier existence. Law and order is what they need."
The Knights Party claims to be nonviolent, and there is no evidence in the record that it is not. But it is also worth noting that while the Knights Party officially disclaims violence, distance from violence is a tactic that traditional Ku Klux Klan groups have used in the past.[67] It has been historically common for the Ku Klux Klan to publically deny that its movement has engaged in illegal activity, or even that it is racist or anti-Semitic.[68] Among the first prescripts of the Ku Klux Klan, dating to 1868, is a "formal statement of character and purpose" that proclaims the Ku Klux Klan to be "`an institution of Chivalry, Humanity, Mercy, and Patriotism'" intended "`to protect the weak, the innocent, and the defenceless, from the indignities, wrongs, and outrages of the lawless, the violent, and the brutal'" and to support the U.S. Constitution and constitutional laws.[69] But despite that rhetoric, not dissimilar to that advanced by the Knights Party today,
[i]t would be hard to imagine a greater parody than this on the Ku Klux Klan as it actually operated. It frequently pandered to men's lowest instincts; it bullied or brutalized the poor, the weak, and the defenseless; it was often the embodiment of lawlessness and outrage; . . . and it set at defiance the Constitution and laws of the United States.[70]
The Ku Klux Klan's public statements disavowing lawlessness have often been self-serving attempts to avoid prosecution for acts of violence.[71] But beyond that, even when technically true, they are not entirely compelling, given the nature of Ku Klux Klan ideology. As one historian has observed, the Ku Klux Klan provides "cultural sanction" for violence
from each of the strands in the Klan's world view: its reactionary populism, its racialism, its gender conventions, and its overall alarm about the state of society and government. Together, they worked to prompt and ennoble white male violence undertaken in defense of family and community. To put it another way, there were no significant restraining elements in Klan culture that might act to inhibit violence against outsiders to Klansmen's idea of community.[72]
Stated another way, the Knights Party's attempt to disclaim violence is insufficient to excuse its continued endorsement of a historical legacy of violence, and the inevitably violent consequences of its hateful political and social propaganda. Given the history of the Ku Klux Klan, and the Knights Party's express claim to that history, we have little difficulty in concluding that for all practical purposes, joining the Knights Party is the same as joining the historical Ku Klux Klan. Nor is it difficult to conclude that the historical Ku Klux Klan represents discrimination, violence, and armed resistance to lawful authority.

NEBRASKA PUBLIC POLICY
The State of Nebraska was founded only a year or two after the Ku Klux Klan. Nebraska entered the Union on March 1, 1867, upon the "fundamental condition," imposed by Congress as a requirement for Nebraska's statehood, that "there shall be no denial of the elective franchise, or of any other right, to any person, by reason of race or color."[73] Among the first official acts of the newly assembled Nebraska Legislature was to transmit to the President of the United States its authenticated assent to that condition, so that the President could proclaim Nebraska's admission to the Union.[74] The principle that laws should be enforced without regard to race is, in this sense, not only a fundamental public policy of the State of Nebraskait is the most fundamental public policy of the State, as the condition upon which Nebraska's admission to the Union depended.
That "fundamental condition," as an expression of public policy, is reflected throughout Nebraska law. The Nebraska Constitution provides that "[n]o person shall be . . . denied equal protection of the laws"[75] and, as recently amended, also provides that "[t]he state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting."[76] And since 1867, this state's motto, expressed on the Great Seal of the State of Nebraska, has been "Equality Before the Law."[77]
More recent enactments reflect the same principles. Nebraska law expressly prohibits discrimination on the basis of race or religion in a variety of contexts, including public accommodations,[78] housing,[79] employment,[80] insurance,[81] borrowing and lending,[82] collective bargaining,[83] military procurement,[84] libraries,[85] and National Guard service.[86] The Legislature has also authorized cities and villages to enact their own anti-discrimination provisions.[87] Nebraska law expressly provides that "[a] person in the State of Nebraska has the right to live free from violence, or intimidation by threat of violence . . . regardless of his or her race, color, religion, ancestry, national origin, gender, sexual orientation, age, or disability"[88] and imposes enhanced criminal penalties upon those who violate those rights.[89]
It is the clearly established public policy of the State of Nebraska that the law should be enforced without discriminating based on the race of its citizens. It is for that reason that this court, pursuant to the administrative authority conferred upon it by the Nebraska Constitution,[90] has promulgated a Code of Judicial Conduct providing that a judge shall perform judicial duties without bias or prejudice.[91] Because the appearance of bias or prejudice is detrimental to the administration of justice, the code also provides that
[a] judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation, or socioeconomic status, and shall not permit staff, court officials, and others subject to the judge's direction and control to do so.[92]
And because membership of a judge in an organization that practices invidious discrimination gives rise to perceptions that the judge's impartiality is impaired, a judge "shall not hold membership in any organization that practices invidious discrimination on the basis of race, sex, religion, or national origin."[93]
But the most direct expression of the importance of ensuring that citizens perceive law enforcement to be free of discrimination is Nebraska's racial profiling act.[94] The act explains, "Racial profiling is a practice that presents a great danger to the fundamental principles of a democratic society. It is abhorrent and cannot be tolerated."[95] The act prohibits police, expressly including a member of the State Patrol, from engaging in racial profiling[96] and requires law enforcement agencies, including the State Patrol, to adopt a written policy prohibiting the practice.[97] And it imposes requirements intended to measure and prevent the practice of racial profiling.[98]
The act is particularly pertinent because of the determination of public policy that led to its enactment. As the senator introducing the measure to the Legislature explained, "[t]he problem is that regardless of whether there is racial profiling in Nebraska or not, there is the perception of unfairness."[99] The executive director of the Nebraska Equal Opportunity Commission, testifying in support of the legislation, agreed that "we must admit that there is a perception, and I use the word perception loosely because actually, it's more than a perception, that some officers are engaging in racial profiling, and this has created resentment and distrust of the police, particularly in communities of color."[100] And the chairperson of the Judiciary Committee explained that "[t]he people of Nebraska greatly appreciate the hard work and dedication of law enforcement officers in protecting the public" and that "[t]he good name of these officers should not be tarnished by the actions of those few who commit discriminatory practices."[101] As the introducing senator explained,
Nebraska has always been a diverse state with an immigrant background. Our heritage and disposition has been that of being inclusive and accepting [in] nature. This is one of the greatest traits of our state. That's why I believe it's important to present an open, fair law enforcement image for our state. . . . The problem that we have, regardless of whether there's racial profiling existing in Nebraska or not, [is that] we have the perception of unfairness. Because of that perception, many people who are stopped for a legitimate reason may think that they're being stopped [or] targeted due to their race. We need to collect data to determine whether the racial profiling does exist in our state, and to remove the perception of unfairness that we have.[102]
[6,7] Taken as a whole, this authority evidences an explicit, well-defined, and dominant public policy of the State of Nebraska that is as old as the State itself: that the laws of Nebraska should be enforced without racial or religious discrimination. But more importantly, this public policy incorporates, and depends upon, the public's reasonable perception that the laws are being enforced without discrimination. And the Legislature's determination in that regard makes sense. Under our system of government, the duty of law enforcement can be performed effectively only with the consent of the vast majority of those citizens policed. Efficient law enforcement requires mutual respect, trust, and support.[103] As the Supreme Judicial Court of Massachusetts has persuasively explained,
"One of the most important police functions is to create and maintain a feeling of security in communities. To that end, it is extremely important for the police to gain and preserve public trust, maintain public confidence, and avoid an abuse of power by law enforcement officials.". . . "The image presented by police personnel to the general public . . . `also permeates other aspects of the criminal justice system and impacts its overall success.'"[104]
We agree, and we hold that Nebraska public policy precludes an individual from being reinstated to serve as a sworn officer in a law enforcement agency if that individual's service would severely undermine reasonable public perception that the agency is uniformly committed to the equal enforcement of the law and that each citizen of Nebraska can depend on law enforcement officers to enforce the law without regard to race. We emphasize that this public policy is only implicated by behavior of the gravest nature. But we find that Henderson's knowing and willing affiliation with the Ku Klux Klan is such behavior.

HENDERSON'S REINSTATEMENT VIOLATES

NEBRASKA PUBLIC POLICY
The State Patrol argues that the arbitration award violates public policy because it requires the State Patrol "to employ as a law enforcement officer an individual who has voluntarily associated himself with the [Ku Klux Klan] and the principles it espousesarguably the most reviled, feared, violent, and racist organization in this country's history."[105] The State Patrol concludes that requiring Henderson's reinstatement "ignores the reality that a law enforcement officer who embraces a creed of racial bias and racial superiority breeds distrust, fear, and apprehension among members of the public [and] raises concerns among the public that his employer and fellow officers may harbor similar beliefs."[106] We agree.
Given the Ku Klux Klan's history, any choice to join that organization is a choice to associate with a symbol of violence and terrorism. We also note that Henderson's membership in the Knights Party is consistent with a long-established Ku Klux Klan strategy of recruiting and publicizing the membership of law enforcement officers. The Ku Klux Klan has historically enrolled or enlisted the support of law enforcement officers, to stave off indictment when victims of violence, "having recognized law enforcement officials among their assailants, understandably believed prosecution futile."[107] Consistent with that strategy, Henderson's continued service as a sworn employee of the State Patrol would directly advance the interests of the Ku Klux Klan by fostering the perception that some citizens of Nebraska do not enjoy the same protection by law enforcement as others.
We recognize that Henderson was not an overly active member of the Ku Klux Klan. But this was not a case of, as Henderson contended at oral argument, merely "getting on the wrong web site at the wrong time." It is beyond dispute that he willingly joined the Knights party, knowing that he was effectively joining the Ku Klux Klan. in joining, he endorsed a point of view that is completely antithetical to the principles of Nebraska law that he was bound by oath to enforce. He provided direct financial support for the Ku Klux Klan's racist activities. And his membership has provided the Ku Klux Klan with valuable publicity and propaganda.
The fact is that Henderson chose to associate himself with the Ku Klux Klan and everything that the Ku Klux Klan representsa legacy of hatred, bigotry, violence, and terror that is utterly inconsistent with the responsibilities of a member of the Nebraska State Patrol. One cannot simultaneously wear the badge of the Nebraska State Patrol and the robe of a Klansman without degrading what that badge represents when worn by any officer.
Although arbitration decisions are given great deference, they are not sacrosanct.[108] Here we cannot say that the strong public policy favoring arbitration should trump the explicit, well-defined, and dominant public policy that laws should be enforced without racial or religious discrimination, and the public should reasonably perceive this to be so. Having associated himself with the Ku Klux Klan, Henderson's return to duty would involuntarily associate the State patrol with the Ku Klux Klan and severely undermine public confidence in the fairness of law enforcement and the law itself. Therefore, we conclude that the arbitrator's decision reinstating Henderson to the Nebraska State patrol violates Nebraska public policy and that the district court correctly refused to enforce the award. Henderson and SLEBC's assignment of error lacks merit.

CONCLUSION
For the foregoing reasons, the decision of the district court is affirmed.
Affirmed.
HEAVICAN, C.J., not participating.
WRIGHT, J., not participating in the decision.
STEPHAN, J., dissenting.
To most people, it would seem patently obvious that the termination of Robert Henderson's employment with the Nebraska State Patrol was justified because his membership in the Knights Party, an affiliate of the Ku Klux Klan, reflects negatively on the State Patrol and could impair its operations or efficiency. But that is not what the arbitrator concluded. While I share the majority's doubt that the arbitrator decided this case correctly, I respectfully disagree with its conclusion that the narrow public policy exception to binding arbitration bars judicial enforcement of the award.
As the majority acknowledges, judicial review of an arbitration award is severely circumscribed.[1] We have noted:
Appellate review of an arbitrator's award is necessarily limited because "to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all the quick resolution of disputes and the avoidance of the expense and delay associated with litigation." . . . "[S]trong deference [is] due an arbitrative tribunal." . . . Furthermore, "'[w]hen . . . parties [agree] to arbitration, they [agree] to accept whatever reasonable uncertainties might arise from the process.'"[2]
Arbitration is not a judicial proceeding; it is purely a matter of contract.[3] Because parties to a collective bargaining agreement have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, "it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts."[4] "[I]mprovident, even silly," factfinding by an arbitrator does not permit a court to set aside an award.[5]
In this case, the arbitrator found that Henderson was fired not "because of his actions on the job," but, rather, "because of his beliefs and because he sought out others who shared his beliefs." The arbitrator determined that "the antagonism [Henderson] seems to feel towards non-white racial groups has never reared its ugly head on the job" and that the State patrol "was not able to point to a single instance on the job" where Henderson's actions "exhibited any hatred, anger, disgust, or discrimination towards any minority group." The arbitrator found, based on the State patrol's own data, that Henderson conducted traffic stops "in a race-neutral manner." The arbitrator found that while Henderson
may have personal philosophies that would disgust many citizens of Nebraska, nevertheless, he has well-hidden those beliefs and they have not interfered with his impartial enforcement of the law. The Arbitrator has been persuaded that, to just about anyone he knows or interacts with professionally, [Henderson] projects himself as "an example of stability, fidelity and morality." Furthermore, there is no evidence or credible testimony that [Henderson's] affiliation with the Knight's Party/ KKK impaired "the operation or efficiency of the State Patrol or the employee" or that his reinstatement will likely impair "the operation or efficiency of the State patrol or the employee."
Based upon the record made during a 12-hour hearing, the arbitrator concluded that "the State Patrol violated the Constitution, the Contract, and its own policies and procedures" when it discharged Henderson. In a finding particularly relevant to the issue before this court, the arbitrator stated:
It is very likely that, under [several] decisions of the United States Supreme Court, the State Patrol could have successfully defended the constitutionality of its decision to terminate [Henderson] by either showing some actual harm to its ability to maintain discipline and good order within the ranks, or by showing some actual diminution in the State Patrol's ability to perform its police function.
That said, the State Patrol bore the burden of showing such disruptions, and the Patrol failed to meet this burden. In the final analysis, all that the Agency presented to the Arbitrator was surmise and speculation that some operational or community-relations harm could occur; this was precious little upon which to hang the "hat" of deciding to terminate [Henderson].
The arbitrator also found that the State Patrol failed to show "any minimally-persuasive evidence that [Henderson's] actions or beliefs would cause disruptions in [Henderson's] ability to effectively work with the Patrol's black Troopers, or that [Henderson's] actions or beliefs would cause the Patrol difficulties with respect to the morale, efficiency, or good order of the State Patrol."
As much as we may disagree with these findings, we are bound by them under well-established principles of arbitration law. I agree with the majority that in deciding whether the arbitrator's award should be enforced, our focus is solely on the remedy, which in this case is an order of reinstatement. To paraphrase Eastern Associated Coal Corp. v. Mine Workers,[6] the issue presented is not whether Henderson's conduct violated public policy, but whether the enforcement of the arbitration award requiring his reinstatement would do so.
The majority correctly states that it is the "public policy of the State of Nebraska that the law should be enforced without discriminating based on the race of its citizens." But in light of the arbitrator's factual findings, Henderson's reinstatement would not, in and of itself, automatically result in racial profiling or some other form of discriminatory law enforcement. The mere fact of Henderson's reinstatement, without more, would not violate any constitutional or statutory provision making racial discrimination unlawful. Only some unlawful conduct committed by Henderson after reinstatement could violate such laws and the public policy upon which they are based. And it cannot be said on this record that such conduct is even likely, given the arbitrator's finding that despite his personal beliefs, Henderson has never breached his duty to enforce the law fairly and impartially in the past. With respect to his future conduct, Henderson would be bound by his oath to enforce the law fairly and in a nondiscriminatory manner, and he would be subject to the same civil and criminal liabilities as any other public officer if he failed to do so.[7]
The majority reasons that the public policy of nondiscriminatory law enforcement "incorporates, and depends upon, the public's reasonable perception that the laws are being enforced without discrimination." It then accepts the State Patrol's argument that a law enforcement officer with Henderson's affiliations "`breeds distrust, fear, and apprehension among members of the public [and] raises concerns among the public that his employer and fellow officers may harbor similar beliefs.'" Were we deciding this issue in the first instance, I would agree. But our review requires that we give deference to the findings of the arbitrator, and the conclusion reached by the majority necessarily rejects the arbitrator's specific finding that Henderson's past affiliation had not and would not impair the mission of the State Patrol. By defining public policy so broadly as to incorporate public perception of possible future harm, the majority has simply upheld the State Patrol's initial determination that Henderson's affiliation with the Knights Party reflected negatively on the State Patrol and brought the Patrol into disrepute. While this may seem perfectly logical, it necessarily repudiates the arbitrator's findings that Henderson's personal affiliations and beliefs, however reprehensible, have not affected his ability or that of the State Patrol to fairly and impartially enforce the law.
Reasoning similar to that of the majority in this case was explicitly rejected by the Supreme Court in Paperworkers v. Misco, Inc.[8] That case involved a machine operator who was apprehended in the back seat of a car that was parked on the employer's premises. There was marijuana smoke in the vehicle and a lighted marijuana cigarette in the front seat ashtray. The employee did not own the car. The employee was discharged for violating rules prohibiting the possession of drugs on company premises, and the matter was submitted to arbitration. The arbitrator determined that there was no proof that the employee had actually possessed marijuana on company property and, thus, that there was no just cause for the discharge. The arbitrator ruled the employee was entitled to reinstatement with full seniority and backpay. A federal district court refused to enforce the award on public policy grounds, and an appeals court affirmed, concluding that reinstatement would violate the public policy against operation of dangerous machinery by persons under the influence of drugs or alcohol. The Supreme Court determined that while this judgment was "firmly rooted in common sense," it did not justify refusal to enforce the award.[9] The Court held that the appeals court had improperly drawn inferences from the facts, and it stressed that whether the employee "had ever been or would be under the influence of marijuana while he was on the job and operating dangerous machinery is an exercise in factfinding" which was the arbitrator's function, not the appellate court's.[10] The Supreme Court made it very clear that even an inquiry into a "possible violation of public policy" does not "excuse a court for doing the arbitrator's task,"[11] noting:
Had the arbitrator found that [the employee] had possessed drugs on the property, yet imposed discipline short of discharge because he found as a factual matter that [the employee] could be trusted not to use them on the job, the Court of Appeals could not upset the award because of its own view that public policy about plant safety was threatened.[12]
With respect to Henderson, the majority here is doing precisely what the Supreme Court prohibited.
The arbitrator's findings in this case are similar to those considered by a New York appellate court in State Corr. Officers & Pol. Benev. v. State.[13] There, a correctional officer was suspended from duty for flying a Nazi flag from the front porch of his home on the 55th anniversary of Adolph Hitler's declaration of war on the United States. Several newspapers throughout the state reported the event. The department of correctional services charged the officer with violating rules prohibiting off-duty conduct which would "'reflect discredit upon the Department or its personnel'" and prohibiting an officer from affiliating with groups having interests which would "'interfere with the impartial and effective performance'" of the officer's duties.[14] The suspension was submitted to arbitration, and the arbitrator found no nexus between the officer's off-duty misconduct and his employment, noting the absence of "evidence that his conduct harmed the Department's business, adversely affected [the officer's] ability to perform his job, or caused co-workers not to work with him."[15] The arbitrator concluded that the projection of possible harm, as opposed to actual harm, was not sufficient to permit restriction of the officer's symbolic free speech or regulation of his off-duty conduct.
The court rejected the department's request that the arbitration award be vacated on public policy grounds. It noted that it was bound by the arbitrator's decision unless it could determine that the award violated public policy in the form a "well-defined constitutional, statutory or common law of this State."[16] It concluded that because neither state statutes, regulations, nor the employee manual "proscribes the reinstatement of an employee who engaged in conduct as established here but who nevertheless is found not guilty of the charges as submitted to the arbitrator,"[17] it could not vacate the award as violative of public policy. The court noted that "[a]s abhorrent as [the officer's] personal conduct is, Judges cannot reject the factual findings of an arbitrator simply because they do not agree with them."[18] The court also rejected the department's request that it apply a balancing test to determine that the officer's right to freedom of expression was outweighed by the governmental interest in the safe and efficient operation of the correctional facility, concluding
[t]o do so . . . would require us to invade the province of the arbitrator under the guise of public policy, and to reexamine and redetermine the merits of the case. By submitting the issue of [the officer's] conduct to arbitration, the parties placed upon the arbitrator the responsibility of passing on the implications of [his] offensive conduct under the collective bargaining agreement. We must honor the choice of the parties to have their controversy decided in that forum.[19]
In my view, the majority has rejected the findings of the arbitrator and redecided the merits of this case under the guise of public policy. I could accept the reasoning of the majority that Henderson's reinstatement would foster "the perception that some citizens of Nebraska do not enjoy the same protection by law enforcement as others" if the arbitrator had made any findings that Henderson's affiliation with the Knights Party affected the performance of his duties, because in that circumstance there would be a factual basis upon which to conclude that Henderson could not be trusted with the duties and responsibilities of law enforcement.[20] But the arbitrator actually made specific affirmative findings that Henderson's beliefs "have not interfered with his impartial enforcement of the law," and it is therefore entirely speculative to conclude that the public would have a contrary perception if he were reinstated.
In concluding that Henderson's reinstatement would violate public policy by creating a public perception of discriminatory law enforcement, the majority disregards the following provision of the award specifically designed to prevent or mitigate any such perception:
Nothing in this Award shall prevent the Nebraska State Patrol from reassigning [Henderson] in the future, if necessary to maintain the good order and efficiency of the Agency, or to eliminate/mitigate actual civil disruptions that may occur as a result of the public becoming aware of [Henderson's] association with the Knight's [sic] Party, Christian Concepts, the Ku Klux Klan, or any other such group[.]
Henderson's counsel acknowledged at oral argument that if the award were enforced and Henderson were reinstated, the State Patrol "could assign him to the supply division. They could [assign] him to communications. They could have him cleaning out desks for the next three or four years if they wished to do that." Other courts, including the Supreme Court, have considered the flexibility of an arbitral award of reinstatement in considering whether it violated public policy. In Misco, Inc.,[21] where the machine operator charged with marijuana use was ordered reinstated to his old position or an equivalent one for which he was qualified, the Supreme Court noted that the employer had not established that he "would pose a serious threat to the asserted public policy in every job for which he was qualified."[22] Similarly, the Eighth Circuit Court of Appeals held that an arbitration award requiring reinstatement of an employee who had breached safety regulations at a liquid natural gas storage facility did not violate public policy where it permitted reassignment to a different, less-sensitive position in which safety concerns were not implicated.[23]
Finally, I am concerned that the majority understates the significance of the arbitrator's finding that Henderson's discharge violated his First Amendment rights. Again, while we may disagree strongly with this finding, we are bound by it in the procedural posture of this case. That being so, the result reached by the majority necessarily implies that it is willing to ignore the State's violation of Henderson's constitutional rights because if he were reinstated, the public may perceive that he may violate someone else's rights in the future, despite the arbitrator's specific findings that he has never done so in the past. In my view, this apparent subordination of individual constitutional rights to the "greater good" poses a far greater risk of harm to the public policy of this state than reinstating one misguided trooper and reassigning him to some mundane position well behind the front lines of law enforcement, where he would pose no actual or reasonably perceivable threat to the mission of the State Patrol or the welfare of the public it serves.
In summary, while I disagree with many of the arbitrator's factual findings and legal conclusions and share the majority's revulsion toward Henderson's affiliation with the Knights Party and everything that organization stands for, I cannot conclude that the award of reinstatement would violate public policy under the restrictive standard prescribed by the U.S. Supreme Court in W. R. Grace & Co. v. Rubber Workers[24]; Misco, Inc.[25]; and Eastern Associated Coal Corp.[26] I therefore respectfully dissent.
CONNOLLY, J., joins in this dissent.
NOTES
[1] Neb. Rev. Stat. §§ 25-2601 to 25-2622 (Reissue 2008).
[2] See § 25-2613.
[3] Hartman v. City of Grand Island, 265 Neb. 433, 657 N.W.2d 641 (2003). See, also, e.g., PaineWebber, Inc. v. Agron, 49 F.3d 347 (8th Cir. 1995); C.R. Klewin Northeast v. City of Bridgeport, 282 Conn. 54, 919 A.2d 1002 (2007) (determination of whether arbitration award violates public policy is reviewed de novo by appellate court).
[4] See Cornhusker Internat. Trucks v. Thomas Built Buses, 263 Neb. 10, 637 N.W.2d 876 (2002).
[5] See 9 U.S.C. §§ 1 to 16 (2006). See, also, Southland Corp. v. Keating, 465 U.S. 1, 104 S. Ct. 852, 79 L. Ed. 2d 1 (1984); Smith Barney, Inc. v. Painters Local Union No. 109, 254 Neb. 758, 579 N.W.2d 518 (1998).
[6] §§ 25-2601 to 25-2622. See Hartman, supra note 3.
[7] Jones v. Summit Ltd. Partnership Five, 262 Neb. 793, 635 N.W.2d 267 (2001), citing Apex Plumbing Supply v. U.S. Supply Co., 142 F.3d 188 (4th Cir. 1998).
[8] Jones, supra note 7, 262 Neb. at 798, 635 N.W.2d at 271.
[9] Id.
[10] Id., citing Raiford v. Merrill Lynch, Pierce, Fenner & Smith, 903 F.2d 1410 (11th Cir. 1990).
[11] Paperworkers v. Misco, Inc., 484 U.S. 29, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987).
[12] Id.
[13] See W. R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983).
[14] See, e.g., Weicherding v. Riegel, 160 F.3d 1139 (7th Cir. 1998); McMullen v. Carson, 754 F.2d 936 (11th Cir. 1985).
[15] See § 25-2613(a).
[16] See W. R. Grace & Co., supra note 13.
[17] Id.
[18] Misco, Inc., supra note 11.
[19] Eastern Associated Coal Corp. v. Mine Workers, 531 U.S. 57, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000).
[20] W. R. Grace & Co., supra note 13, 461 U.S. at 766 (citations omitted).
[21] Misco, Inc., supra note 11.
[22] Id. at 35.
[23] Id. at 42.
[24] Id.
[25] Id.
[26] Id. at 43.
[27] W. R. Grace & Co., supra note 13.
[28] Id.
[29] Misco, Inc., supra note 11, 484 U.S. at 43.
[30] W. R. Grace & Co., supra note 13.
[31] Misco, Inc., supra note 11, 484 U.S. at 44.
[32] Id.
[33] Eastern Associated Coal Corp., supra note 19.
[34] Id. at 62-63.
[35] Id. at 63.
[36] See W. R. Grace & Co., supra note 13, and Misco, Inc., supra note 11.
[37] Eastern Associated Coal Corp., supra note 19.
[38] Misco, Inc., supra note 11.
[39] See, e.g., Lexington Ins. Co. v. Entrex Comm. Servs., 275 Neb. 702, 749 N.W.2d 124 (2008); Stewart v. Bennett, 273 Neb. 17, 727 N.W.2d 424 (2007); Myers v. Nebraska Equal Opp. Comm., 255 Neb. 156, 582 N.W.2d 362 (1998); Custer Public Power Dist. v. Loup River Public Power Dist., 162 Neb. 300, 75 N.W.2d 619 (1956).
[40] See, e.g., Westmoreland v. Westmoreland Intermediate, 595 Pa. 648, 939 A.2d 855 (2007); In re Merrimack County (NH PELRB), 156 N.H. 35, 930 A.2d 1202 (2007); NJ Turnpike Auth. v. Local 196, 190 N.J. 283, 920 A.2d 88 (2007); Metro. Police Dept. v. Public Employee, 901 A.2d 784 (D.C. 2006); City of Boston v. Boston Police Patrolmen's, 443 Mass. 813, 824 N.E.2d 855 (2005); CVN Group, Inc. v. Delgado, 95 S.W.3d 234 (Tex. 2002); Regional Transit Auth. v. Transit Union, 91 Ohio St. 3d 108, 742 N.E.2d 630 (2001); State Corr. Officers & Pol. Benev. v. State, 94 N.Y.2d 321, 726 N.E.2d 462, 704 N.Y.S.2d 910 (1999); Buzas Baseball v. Salt Lake Trappers, 925 P.2d 941 (Utah 1996); State Auditor v. Minn. Ass'n of Pro. Emp., 504 N.W.2d 751 (Minn. 1993); Bureau of Maine State Police v. Pratt, 568 A.2d 501 (Me. 1989); AFSCME v. State of Illinois, 124 Ill. 2d 246, 529 N.E.2d 534, 124 Ill. Dec. 553 (1988); New Haven v. AFSCME, Council, Local 530, 208 Conn. 411, 544 A.2d 186 (1988); Amalgamated Transit Union v. MTA, 305 Md. 380, 504 A.2d 1132 (1986).
[41] See Eastern Associated Coal Corp., supra note 19.
[42] See id.
[43] Because of the informal style of these messages, there are various grammar, spelling, and syntax errors. Indicating each error with a "[sic]" would be distracting, so we reproduce each of the messages in its original form.
[44] See Church of the Ku Klux Klan v. Kerik, 356 F.3d 197 (2d Cir. 2004). See, also, Allen W. Trelease, White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction (1971).
[45] See, Kerik, supra note 44; Trelease, supra note 44.
[46] Trelease, supra note 44 at xi. See, also, Kerik, supra note 44.
[47] Trelease, supra note 44 at xlvi.
[48] Anti-Defamation League, Ku Klux Klan  History, http://www.adl.org/ learn/ext_us/kkk/history.asp (last visited February 26, 2009).
[49] See, generally, Virginia v. Black, 538 U.S. 343, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003).
[50] See id.
[51] Brown v. Board of Education, 349 U.S. 294, 75 S. Ct. 753, 99 L. Ed. 1083 (1955).
[52] See, generally, Black, supra note 49; John George & Laird M. Wilcox, Nazis, Communists, Klansmen, and Others on the Fringe: Political Extremism in America (1992), citing George Thayer, The Farther Shores of Politics (1967).
[53] KKK: Inside American Terror (National Geographic Channel television broadcast Oct. 15, 2008).
[54] See id.
[55] Id.
[56] Michael W. Schuyler, The Ku Klux Klan in Nebraska, 1920-1930, 66 Nebraska History 234 (1985).
[57] Id.
[58] Kathryn Watterson, Not By The Sword: How the Love of a Cantor and His Family Transformed a Klansman (1995). See, also, Schuyler, supra note 56; Patricia A. Welker, The Church in Two Diverse Communities During the 1920s: Guthrie Center, Iowa, Sidney, Nebraska, and a Pragmatic Minister, 44 Journal of the West 62 (2005).
[59] Schuyler, supra note 56 at 252.
[60] See, Schuyler, supra note 56; Welker, supra note 58.
[61] See Black, supra note 49, 538 U.S. at 388 (Thomas, J., dissenting), quoting M. Newton & J. Newton, The Ku Klux Klan: An Encyclopedia (1991). See, also, KKK: Inside American Terror, supra note 53.
[62] See Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 115 S. Ct. 2440, 132 L. Ed. 2d 650 (1995) (Thomas, J., concurring).
[63] Church of Amer., Ku Klux Klan v. City of Gary, IN, 334 F.3d 676 (7th Cir. 2003).
[64] Shawn Lay, ed., The Invisible Empire in the West: Toward a New Historical Appraisal of the Ku Klux Klan of the 1920s at 1 (1992).
[65] KKK: Inside American Terror, supra note 53.
[66] See Church of American Knights Ku Klux v. City of Erie, 99 F. Supp. 2d 583 (W.D. Pa. 2000).
[67] KKK: Inside American Terror, supra note 53.
[68] See Nancy MacLean, Behind the Mask of Chivalry: The Making of the Second Ku Klux Klan (1994). See, also, George & Wilcox, supra note 52.
[69] Trelease, supra note 44 at 16-17.
[70] Id. at 17.
[71] See MacLean, supra note 68.
[72] Id. at 150.
[73] See Gen. Stat. ch. 1 (1873).
[74] See id.
[75] Neb. Const. art. I, § 3.
[76] Id., § 30(1).
[77] See Neb. Rev. Stat. § 84-501 (Reissue 2008).
[78] See Neb. Rev. Stat. §§ 20-132, 20-134, and 20-139 (Reissue 2007).
[79] See Neb. Rev. Stat. §§ 20-318 (Reissue 2007) and 76-1495 (Reissue 2003).
[80] See Neb. Rev. Stat. §§ 23-2531 (Reissue 2007), 48-1101 et seq. (Reissue 2004), and 81-1355 (Reissue 2008).
[81] See Neb. Rev. Stat. § 44-7510 (Reissue 2004).
[82] See Neb. Rev. Stat. § 45-1056 (Reissue 2004).
[83] See Neb. Rev. Stat. § 48-214 (Reissue 2004).
[84] See Neb. Rev. Stat. § 48-215 (Reissue 2004).
[85] See Neb. Rev. Stat. § 51-211 (Reissue 2004).
[86] See Neb. Rev. Stat. § 55-134 (Reissue 2004).
[87] See Neb. Rev. Stat. §§ 18-1724 and 20-113 (Reissue 2007).
[88] Neb. Rev. Stat. § 28-110 (Reissue 2008).
[89] See Neb. Rev. Stat. § 28-111 (Reissue 2008).
[90] See Neb. Const. art. V, § 1.
[91] See Neb. Code of Judicial Conduct § 5-203(B)(5).
[92] See id.
[93] See Neb. Code of Judicial Conduct § 5-202(C).
[94] See Neb. Rev. Stat. § 20-501 et seq. (Reissue 2007).
[95] § 20-501.
[96] § 20-502.
[97] § 20-504.
[98] See § 20-501 et seq.
[99] Floor Debate, L.B. 593, 97th Leg., 1st Sess. 7954 (May 22, 2001).
[100] Judicary Committee Hearing, L.B. 593, 97th Leg., 1st Sess. 13 (Mar. 7, 2001).
[101] Floor Debate, supra note 99 at 7955.
[102] Judiciary Committee Hearing, supra note 100 at 2.
[103] McMullen, supra note 14. See, also, Weicherding, supra note 14.
[104] City of Boston, supra note 40, 443 Mass. at 819-20, 824 N.E.2d at 861 (citation omitted).
[105] Brief for appellees at 30.
[106] Id. at 38.
[107] MacLean, supra note 68 at 170.
[108] City of Boston, supra note 40.
[1] See Jones v. Summit Ltd. Partnership Five, 262 Neb. 793, 635 N.W.2d 267 (2001).
[2] Id. at 798, 635 N.W.2d at 271 (citations omitted).
[3] See, Cornhusker Internat. Trucks v. Thomas Built Buses, 263 Neb. 10, 637 N.W.2d 876 (2002); Kelley v. Benchmark Homes, Inc., 250 Neb. 367, 550 N.W.2d 640 (1996), disapproved on other grounds, Webb v. American Employers Group, 268 Neb. 473, 684 N.W.2d 33 (2004).
[4] Paperworkers v. Misco, Inc., 484 U.S. 29, 37-38, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987).
[5] Id. at 39.
[6] Eastern Associated Coal Corp. v. Mine Workers, 531 U.S. 57, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000).
[7] See, 18 U.S.C. § 242 (2006); 42 U.S.C § 1983 (2000); Neb. Rev. Stat. § 20-148 (Reissue 2007).
[8] Paperworkers v. Misco, Inc., supra note 4.
[9] Id. at 44.
[10] Id. at 44-45.
[11] Id. at 45.
[12] Id.
[13] State Corr. Officers & Pol. Benev. v. State, 94 N.Y.2d 321, 726 N.E.2d 462, 704 N.Y.S.2d 910 (1999).
[14] Id. at 324-25, 726 N.E.2d at 464, 704 N.Y.S.2d at 912.
[15] Id. at 325, 726 N.E.2d at 465, 704 N.Y.S.2d at 913.
[16] Id. at 328, 726 N.E.2d at 467, 704 N.Y.S.2d at 915.
[17] Id.
[18] Id.
[19] Id.
[20] See City of Boston v. Boston Police Patrolmen's, 443 Mass. 813, 824 N.E.2d 855 (2005).
[21] Paperworkers v. Misco, Inc., supra note 4.
[22] Id. at 45.
[23] Midamerican Energy v. Intern. Broth. of Elec., 345 F.3d 616 (8th Cir. 2003).
[24] W. R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983).
[25] Paperworkers v. Misco, Inc., supra note 4.
[26] Eastern Associated Coal Corp. v. Mine Workers, supra note 6.